IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

ADRIAN HOYLE,

     Plaintiff,

vs.

                             CAUSE NO.: 3:21-cv-171NBB-RP
                             JURY DEMANDED

CITY OF HERNANDO, SCOTT WORSHAM,
in his official capacity as Chief of Police of the
Hernando Police Department, OFFICER
LYNN BROWN, Individually and in his
official capacity as a Hernando Police Officer,
and OFFICER HUNTER SOLOMON,
Individually and in his official capacity as a
Hernando Police Officer

     Defendants.

## PLAINTIFF, ADRIAN HOYLE'S, MEMORANDUM IN RESPONSE TO THE MUNICIPAL DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

COMES NOW, Plaintiff, Adrian Hoyle (hereinafter Hoyle) and files this his

Memorandum in Response to the Municipal Defendants' Motion for Judgment on the Pleadings

or, in the Alternative, for Summary Judgment (Doc. No. 12) and Municipal Defendants'

Memorandum in Support of Motion for Judgment on the Pleadings or, in the Alternative, for

Summary Judgment (Doc. No. 13) and would respectfully state as follows:

### CANDOR WITH THE COURT

Plaintiff, through his lawyers, would like to first address counsel for Defendants, Lynn

Brown (hereinafter Brown), Scott Worsham (hereinafter Worsham) and the City of Hernando's,

rendition of facts from the standpoint of fairly addressing counsel's accusations that the "sham"

Complaint contains false depictions of the facts. Counsel for the City of Hernando, Worsham and Brown refers to *In re Ronco, Inc.,* 838 F.2d 212, 218 (7th Cir. 1988) urging this Court to find sanctionable conduct on the part of Hoyle and his counsel for omitting relevant and accurate facts.

It seems that Defendants' counsel believes that a car chase which ended when Hoyle surrendered before being bitten by Brown's K-9 and beaten senseless by Officer Hunter Solomon (hereinafter Solomon) bears mentioning and that it was dishonest on the part of Hoyle's counsel for not disclosing the car chase. What preceded Brown and Solomon's attack on a surrendered suspect really bears little relevance,[FN1] but since Defendants' counsel wants to tell the Court their rendition of the facts and accuses Hoyle's counsel of dishonesty for not doing so; Hoyle will respond.

First, repeatedly, counsel for Defendants refers to Hoyle being chased in a car that Hoyle had stolen. This is like the pot calling the kettle black when it comes to obfuscating the true facts.

The truth, which will not be disputed, is that at the time Brown initiated his dangerous high speed chase, Brown, nor any other officer, dispatcher or police chief knew that Hoyle's vehicle in which he was traveling was stolen. The truth is that Brown and the Hernando Police Department only learned this fact <u>after</u> the high speed chase, and <u>after</u> Hoyle had been attacked by Brown's K-9 and savagely beaten by Solomon.

Hoyle himself volunteered to the police this fact in response to casual questioning about why he fled from police. That is right -- all of the Defendants' rendition of facts would lead the uninformed to believe that Brown was chasing a stolen car <u>because</u> the car was stolen. (Doc. No

---

[FN1] The guilt or innocence of Adrian Hoyle has no bearing whatsoever on Hoyle's claim for excessive force in the arrest. To argue otherwise is not only a misstatement of the law, but lacks candor with the Court.

13, Page 1, Third Sentence). Granted, Defendants' counsel does not come right out and say that Plaintiff's counsel had left the fact out that Brown was chasing a car <u>because</u> it was stolen, but to say it is strongly inferred would be fair.

Next, counsel for the Defendants fails to adequately inform the Court that the red light that Hoyle supposedly disregarded was in no way witnessed by Brown, and in fact, the only video evidence of the color of Brown's south bound Highway 51 traffic light is that it was in fact <u>green</u>. (See Hernando's dash cam video of Brown's initiation of the chase. As Brown makes his U-turn, carefully observe the color of the traffic light facing south bound, the direction of Brown). The "sham" is the pre-textual misdemeanor stop that Brown initiated. (A viewing of Brown's dash cam while he was sitting in traffic quite a distance from the traffic light shows that east and west bound cross traffic at that light is either stopped or stopping as Brown makes his U-turn. The viewer can see that there is no follow on traffic behind the suspect, and that south bound traffic had a green light).

Next, counsel for the Defendants conveniently left out of his rendition of "facts" that Brown was not only violating Hernando pursuit policy in continuing the chase, but also that Brown refused to immediately terminate that high speed chase as ordered by his supervisor, Lieutenant Robert Scott. Had Brown followed his supervisor's order to terminate the pursuit, the wreck or the K-9 deployment or the senseless beating would never have occurred.

It is well documented and established across the United States that police departments do not engage in high speed pursuits in heavy traffic when the suspect being pursued has only violated a misdemeanor traffic law, because a chase will expose other motorists to unacceptable risks. The placement of other motorists in danger by chasing a suspect who is likely to run makes the underlying irresponsible traffic violation much more dangerous. This is why the chase was

ordered to be terminated by Lt. Robert Scott. Counsel for the City of Hernando did not include in their submission the dispatch radio traffic which would have clearly established this fact.

Next, counsel for Defendants left out of the "facts" of the chase that while the law enforcement vehicles and Hoyle's vehicle did in fact come into contact after Hoyle had lost control of his vehicle, it was as a result of the two (2) officers boxing Hoyle's vehicle off the road and blocking his re-entry by them striking Hoyle's vehicle. Brown and the City of Hernando are not being sued for this boxing in action. But to say that Hoyle intentionally ran into the two (2) officers' vehicles is a stretch -- so much so that during Hoyle's guilty plea, which was referred to repeatedly by the Defendants, Hoyle corrected that misstatement in the transcript -- all of which counsel for Defendants did not point out to the court. Because counsel for Defendants did not inform the Court that the chase was for an alleged misdemeanor infraction versus the suggested stolen car charge, had Brown and Solomon complied with the order to terminate the pursuit, none of these dangerous car-on-car contacts would have been made. The present civil rights lawsuit on file is not about a car chase, and it is not about the damaged fenders in having that chase come to an end. This lawsuit is about what happened after the pursuit was ended.

Counsel for Defendants also left out in describing Solomon's "striking" Hoyle, the severity of no less than the seven (7) fist blows to Hoyle's face and head while the K-9 was attacking Hoyle, and Hoyle was surrendered with his hands in the air and was defenseless. As discovery proceeds and the dash cam videos of Brown and Solomon are reviewed by the Court, it will be Brown and Solomon who cannot contradict that Hoyle had ceased fleeing prior to Brown deploying his K-9 to attack Hoyle and prior to Solomon beating Hoyle senseless.[FN2]

---

[FN2] One only has to look at Solomon's police report relied upon by Defendants to dismiss this lawsuit. Solomon is untruthful at best and creates for this Court a disputed issue of material fact as to whether the force used by Solomon (John Doe 1) matches the Amended Complaint's allegations or his rendition.

4

Counsel for Defendants conveniently left out the fact that Solomon had unholstered his weapon and was pointing the weapon at Hoyle immediately after the chase came to an end. But, Solomon then reholstered his weapon after he obviously saw both of Hoyle's hands above his head. When Solomon reholsters his weapon, obviously signifying no need for deadly force or the threat of force, he calmly walks up to Hoyle and repeatedly punches Hoyle in the face while Brown is seen holding Hoyle's arm, and the K-9 is biting Hoyle's leg. Counsel for Hoyle will leave it to the Court to determine if the footnote provided by counsel for Defendants captures the severity of the beating that Solomon can be seen in the City of Hernando's own video.

In referencing the video, counsel for Defendants is quite generous in his timing of the sequence of events. A viewing of the video shows that as immediately as the Hoyle vehicle was placed into 'park,' as can be seen by the shift of the vehicle on the ground, the driver's door immediately opens, and the first thing seen is both of Hoyle's hands. After Hoyle's hands are seen lifted in surrender, then the viewer can see an unleashed K-9 attack Hoyle. Somehow Hoyle initially manages to keep his hands up over his head even during the initial bite.

The K-9 is then permitted to stay on the attack for the better part of a minute even though Hoyle had completely surrendered and was of no threat to the numerous police officers surrounding him. Yet, as can be seen from the video that counsel places such reliance on, Brown never verbally commanded his dog to release Hoyle. Instead, Brown very calmly, slowly and nonchalantly physically pulls the dog off the bite only after Solomon's beating and Brown's handcuffing. By pulling a dog off of a bite versus ordering it to release, it is common knowledge that the biting dog causes more damage as the dog's teeth are removed from the suspect's fleshy tissue.

What can next be seen is Solomon in the presence of at least three (3) other sworn law enforcement officers, and exactly as alleged in the Complaint, stomping and stepping on to the upper torso and chest of Hoyle and stomping Hoyle's chest and head while Hoyle's hands are handcuffed under his back. Solomon, just as was alleged in the "sham" Complaint, appears to wipe his feet on Hoyle. Granted, with two (2) officers looking on directly at what Solomon was doing and attempting to block the dash cam video evidence, one can still clearly see Hoyle screaming in pain as Solomon repeatedly puts his full weight on Hoyle's chest and head all while Hoyle's hands are handcuffed behind him and Hoyle is <u>still</u> being bitten by the K-9.

The truth and bottom line is this: Hoyle ran from Brown's attempted traffic stop. Brown (who was off duty at the time -- another fact left out by counsel for Defendants) over zealously gave chase making the dangerous situation much worse. He continued chasing Hoyle even when his supervisor recognized the extreme risk and ordered it terminated. When the chase <u>ended</u>, Hoyle surrendered, and <u>then</u> Brown sent his K-9 off of its leash to attack Hoyle whose hands were above his head and clearly visible all in broad daylight with multiple officers with weapons at the ready should the fleeing suspect continue to flee or threaten an officer. Hoyle's surrender <u>before</u> the dog is deployed and immediately after the car chase ends with no one having been injured thankfully, is obviously and objectively excessive and sadistic.

Then, while screaming and writhing in pain from the dog biting his right leg, Solomon viciously beats Hoyle with his fists and feet. The excessive force sued upon in this case is the relevant point of consideration, not counsel's attempt to poison the well with cherry picked facts and accusations of Plaintiff's counsels' dishonesty.

Counsel for Defendants puts great store in the guilty plea transcript and dash cam videos. What counsel failed to inform the Court is that Hoyle actually denied, in open court,

intentionally striking the officers' vehicles. Seemingly, Hoyle's denial on the record of that fact was accepted by the trial judge, but to suggest to this Court that Hoyle could somehow know the subjective state of Brown's "fear" when Brown caused the dog to attack Hoyle is ludicrous and impossible and not binding as a judicial admission in the guilty plea.

Briefly, Hoyle would like to point out what federal law actually is regarding the issue of the survivability of a 42 U.S.C. § 1983 claim in light of a plaintiff/criminal suspect's guilty plea or verdict. It seems that the Defendants urge this Court that because Hoyle pled guilty to "felony fleeing" that the injuries suffered by Hoyle during the arrest, or the fact that Hoyle led the police on a chase to begin with bars any recovery. This is simply not the law. Hoyle's lawsuit for a §1983 violation and the injuries resulting from the excessive force as alleged, has nothing to do with the car chase. His success on the 42 U.S.C. § 1983 claim would not vitiate his guilty plea. This common sense approach to a collateral estoppel argument is well accepted from the United States Supreme Court all the way down to the District Courts of Mississippi holding that the underlying arrest or eventual conviction are no bars to a recovery of a 42 U.S.C. § 1983 claim. *Heck v. Humphrey*, 512 U.S. 477 at 486-487 (1994).

In *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000), the Fifth Circuit found that *Heck* did not bar a 42 U.S.C. §1983 suit because "a conviction for aggravated assault against a police officer does not necessarily preclude a finding of excessive force against the assaulter." *Hainze*, 207 F.3d at 798. Keeping in mind that *Hainze* involved an assault between the suspect and a police officer not being a bar to that Plaintiff's 42 U.S.C. § 1983 action, Hoyle was simply charged with fleeing from police and then surrendering. Similarly, Mississippi District Courts have also held and adopted the *Hainze* approach in *Ballard v. Burton*, 444 F.3d 391 (5th Cir. 2006) that a guilty plea is not a bar to a 42 U.S.C. § 1983 action.

Finally, when counsel for the Defendants alleges that Hoyle and his counsel left facts out of the Complaint, it is hoped that this Court will recognize one of the largest omissions. Brown claims "qualified immunity" for his actions of deploying his K-9 without a leash on a suspect who was unarmed and had surrendered. Brown does not inform this Court that Brown knew full well "in a blink" of his own eye that deploying his K-9 to bite and apprehend a suspect and then leaving that K-9 on its bite on the suspect who had clearly surrendered is obviously unreasonable and not protected by qualified immunity. Why? Because that is exactly what Judge Mills informed Brown of nearly five (5) years ago in the case of *Jacob Cooper v. Lynn Brown* 844 F.3d 517 (5th Cir. 2017).

## QUALIFIED IMMUNITY

*Jacob Cooper v. Lynn Brown and the City of Horn Lake,* 844 F.3d 517 (5th Cir. 2017) has been cited on numerous occasions in multiple other Fifth Circuit states for the very proposition that the idea to ask for qualified immunity protection for the very conduct of Brown found in *Cooper,* and also in this case, will not be granted.

No reasonable law enforcement officer would ever think that deploying a K-9 for apprehension against a surrendered suspect whose hands are clearly visible in broad daylight was constitutional. Just in case Brown argues that he may have believed that in 2013 or now in 2020 had been put to rest in Judge Mills' ruling regarding Brown's conduct in *Cooper.*

Of interest to Hoyle and possibly the Court and possibly even Brown's current lawyer, is a little known judicial admission of Lynn Brown himself and his lawyers representing him in *Cooper v. Lynn Brown, et. al.* In *Cooper v. Lynn Brown, et. al.,* Brown's lawyers argued that Brown was entitled to qualified immunity. When Brown's lawyers were urging a dismissal of Cooper's excessive force lawsuit on the grounds of qualified immunity, Brown, through his

8

lawyers, argued that a K-9 deployment on a nonviolent DUI suspect to apprehend and subdue the suspect who was hiding behind a garbage can was quite different, and therefore protected, when compared to a hypothetical K-9 officer causing a K-9 to attack and apprehend a surrendered suspect with his hands up, which in Brown's argument, would be clearly unprotected as obviously unreasonable and excessive force. **That is right!** Brown, more than five (5) years ago, said through his lawyers (which binds Brown to the statement) that the conduct that he actually carried out in Adrian Hoyle's case in 2020 would not be protected from a qualified immunity standpoint.

How so? In the case of *Cooper v. Brown,* case number 3:04-CV-00091-MPM-RP, Doc. No. 50, filed on September 8, 2015, Brown's lawyer, on behalf of Brown, was arguing whether or not the conduct of Brown was violative of "clearly established law." In *Cooper,* the DUI suspect hid at night behind a garbage can, and Brown's dog then bit and held the suspect until Brown could handcuff the suspect. Brown had no backup in the form of another armed officer at the time of Cooper's apprehension. Counsel for Brown argued that Brown's conduct in allowing the apprehension with the use of his K-9 and continuing to let the bite continue until Brown could handcuff the suspect, Cooper, was protected by qualified immunity.

Brown's lawyer at page 9 of Brown's Memorandum in Support of Defendants' Motion for Summary Judgment argues:

> For purposes of qualified immunity, 'clearly established' means that the 'contours of the right' are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right. . .'
>
> The primary concern is fair notice to the officer and the need be a reasonable warning that the conduct then at issue violated constitutional rights. *Hope*, 536 U.S. at 740. (Doc No. 50, Page 9, Paragraph 3).

9

In Brown's lawyer's estimation, Brown's conduct on the night of the *Cooper* case was protected by qualified immunity. So much so that Brown, through his lawyer stated:

> Even under Plaintiff's own version of events, he was squatting in the dark behind a fence panel out of sight of the officer – an act that <u>hardly can be construed as surrendering</u>. **This is absolutely not a case where a suspect had raised his hands to surrender and then was beaten or attacked**. (Doc No. 50, Page 10, Paragraph 1)(Pages 1, 9, 10 and 24 are attached as Exhibit "A")

Counsel for Hoyle attaches two (2) things: (1) a screenshot of Hoyle with his hands clearly visible surrendering to officers at the end of the car chase; and (2) Brown's argument that apprehending a suspect hiding behind the garbage can at night and leaving the apprehending K-9 on the suspect until Brown could get around to putting the handcuffs on the suspect was protected conduct when compared to a hypothetical K-9 officer causing their K-9 to attack a suspect who had surrendered with his hands up.

To actually put forward an argument now on behalf of Brown and thereby the City of Hernando that he is entitled to qualified immunity because he did not violate any clearly established constitutional right under the Fourth and Fourteenth Amendments in light of Brown's past judicial findings, is in fact not very candid with the tribunal and importantly, is not the law in the Fifth Circuit.

## *MONELL* LIABILITY FOR BROWN'S K-9 ABUSE

The City of Hernando, in fact all of the cities in the states within the Fifth Circuit, were put on fair notice by Judge Mills that what might be seen as the negligence of a city in hiring or failing to supervise and control Brown's behavior in 2013 may very well be seen as *Monell* indifference in the future. The <u>future</u> spoken of by Judge Mills in 2017 has now arrived and landed squarely on Hoyle in this arrest. Hoyle has filed this lawsuit and should be given a full

opportunity to develop his evidence and present his case and not have his case dismissed against

Brown, Solomon and the City of Hernando on the grounds of qualified immunity.

The refusal of Brown to disengage his K-9 with a verbal command once the officers were

not in jeopardy (which is obvious by their actions of holstering their weapons and taking seven

(7) free punches to Hoyle's head and face while he was held by Brown) was sadistic. To then pull

and rip at Hoyle's leg by nonchalantly pulling *Groot* off of Hoyle's leg instead of putting the dog

in a "backup" position by verbal command is also evident in the much touted dash cam video.

In *Cooper v. Brown*, Judge Mills stated in his Order:

> What is merely negligent in this case (on the part of the City) may be
> deliberately indifferent in the next, and the court trusts that the City will
> consider the proof developed in this case in deciding how its citizens
> should best be protected from the unjustified use of force. (Order, Page
> 22)

In the case of *Ratliff v. Aransas County, Texas, et. al.*, 948 F.3d 281 (5th Cir. 2020), it was

held that in order for Plaintiff to state a *Monell* claim against Aransas County, Ratliff was

required to plead facts that plausibly establish: "a policymaker; an official policy; and a violation

of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of*

*Houston*, 237 F.3d 567, 578 (5th Cir. 2001). *Ratliff* at 285.

In addition to the theory of widespread and customary police brutality, Ratliff also

alleged that "Defendant County is liable for [the] inadequate training of police officers." To

prevail on a failure-to-train theory, Ratliff must plead facts plausibly establishing "(1) that the

municipality's training procedures were inadequate, (2) that the municipality was deliberately

indifferent in adopting its training policy, and (3) that the inadequate training policy directly

caused the violations in question." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir.

2010). *Ratliff* at 285.

To determine whether Ratliff had done so, the Court assumed genuinely disputed facts in his favor and engage in a two-pronged inquiry. "The first [prong] asks whether the facts... show [that] the officer's conduct violated a [constitutional or statutory] right." *Tolan v. Cotton,* 572 U.S. 650, 655-56, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (brackets and ellipsis added). The second "asks whether the right in question was `clearly established' at the time of the violation." *Id.* at 656, 134 S.Ct. 1861.

In the case at hand, replete throughout the Complaint are specific factual allegations against Brown, John Doe 1 (now known as Hunter Solomon), Chief Worsham and the City of Hernando. The dash cam video, self-serving police reports and certificate of training as a police officer do nothing other than create disputed issues of material fact making the FRCP 12(c) motion and FRCP 56 motion "non-starters."

This is an excessive force case arising from the arrest of Hoyle. Hoyle did not mean to and did not believe that he alleged an unlawful arrest without probable cause. Instead, Hoyle believed that he was clear in alleging an unlawful seizure in the form of excessive force under the Fourth Amendment as applicable to the state through the Fourteenth Amendment.

The Defendants answered the Amended Complaint and denied all of the factual allegations contained in the Complaint supporting liability. In addition to a general denial, the Defendants attached exhibits to their Answer. Specifically, the following allegations were denied:

> 24. The City of Hernando and Chief Worsham have allowed police officers to engage in a pattern of conduct that violates the civil rights of persons residing in or passing through the City of Hernando for years leading up to the serious physical and mental injuries of Hoyle by failing to enforce policies and procedures and by ratifying the unconstitutional conduct of officers by not punishing them and instead allowing them to continue serving as law enforcement officers. The serious physical and mental injuries of Hoyle would be tragic if it were the only time Officer

12

Brown had been found guilty of depriving citizens of their Constitutional rights, but it becomes even more tragic when the overall conduct of the City of Hernando is considered, and the overall picture is seen of a department that has tolerated, ratified and almost encouraged Officer Brown's behavior. It is not enough to have policies that prohibit constitutional violations; the City of Hernando and Chief Worsham must also enforce those policies and must send a clear message to officers that they will not tolerate violations of those policies by officers. Instead of trying to send that message, the City of Hernando and Chief Worsham have chosen to turn a blind eye to the actions of Officer Brown and other flagrant constitutional rights violations by its officers. Upon information and belief, Chief Worsham and the command staff of the Hernando Police Department and very likely the City of Hernando Board of Aldermen not only turned a blind eye **but actually protected Officer Brown when discipline was considered by Officer Brown's supervisor(s) but overruled**.

30. The policy, practice and custom of the police code of silence results in police officers refusing to report instances of police misconduct of which they are aware, despite their obligation under police department regulations to do so. This conduct includes police officers who remain silent or give false or misleading information during official investigations in order to protect themselves or fellow officers from internal discipline or retaliation, civil liability, or criminal prosecution. **Worse, when law abiding law enforcement officers of the Hernando Police Department learn of police misconduct and attempt to report or remedy or discipline officers, and Officer Brown in particular, Chief Worsham and members of his command staff aggressively interfere with attempts to report, discipline or remedy the violations through means of intimidation, harassment and direct unlawful orders.**

31. The injuries of Hoyle could have been avoided had the City of Hernando provided better or more training as to the proper use of force. This lack of adequate training amounts to an unconstitutional policy.

32. **The City of Hernando was on notice of each and every constitutional violation alleged herein taking place by Hernando Police Department Officers, Officer Brown and John Doe 1.**

37. Despite violating the policies, practices and customs of the City of Hernando and state law, upon information and belief, Officer Brown was not disciplined, reprimanded or terminated. Accordingly, the City of Hernando and Chief Worsham ratified, condoned, acquiesced in or approved the conduct of Officer Brown in all respects. As the City of Hernando and Chief Worsham determined that the conduct of Officer Brown, as set forth herein, was in compliance with the policies, practices

and customs of the City of Hernando and the Hernando Police Department, the City of Hernando and Chief Worsham are directly liable for the actions and constitutional violations of Officer Brown and John Doe 1.

38. Moreover, **Officer Brown has a long and well-published history of aggression**. The City of Hernando violated the civil rights of Hoyle through its policies, lack of policies, and/or customs of hiring, firing, retention and supervision. Such policies and customs were the moving force behind the damages sustained by Hoyle in this case.

50. The City of Hernando and Chief Worsham violated the civil rights of Hoyle in that they were deliberately indifferent to the rights of Hoyle and others through their hiring, supervision and retention of officers.

68. **In this case, the suspect, Hoyle, immediately showed his hands by placing them over his head, and yet he still was attacked by Officer Brown's K-9**.

69. District Judge Mills went on to state in his Order:

> Based on his own testimony, Officer Brown does not strike this court as an officer reluctantly resorting to force, but, rather, one only reluctantly *terminating* the use of force. (Order, Page 16)

> This court's impressions regarding Officer Brown's seeming eagerness to employ his police dog is buttressed by the testimony of one of his former co-workers. (Order, Page 17)

> This court is not in a position to judge Officer Brown's character, and it cannot say whether he is simply an overzealous police officer primarily concerned with bringing suspects to justice, or whether there might have been a darker, more sadistic motivation behind his actions. (Order, Page 17)

> What is merely negligent in this case (on the part of the City) may be deliberately indifferent in the next, and the court trusts that the City will consider the proof developed in this case in deciding how its citizens should best be protected from the unjustified use of force. (Order, Page 22)

70. Amazingly, **when a U.S. District Judge gives notice in 2016 to law enforcement agencies regarding the propensity of Officer Lynn Brown; Scott Worsham, when he became the police chief for the City of Hernando Police Department, hired Officer Brown and assigned him a K-9 animal**. If this was not enough, during Officer Brown's tenure

14

at the City of Hernando, Officer Brown "retired." Then, following a stint of providing dog training services elsewhere, he re-applied to the City of Hernando and was again hired by Chief Worsham.

71. While prior litigation regarding a different matter is normally not relevant, **it is quite relevant as it relates to notice of the City of Hernando and the City of Hernando Police Department**, by and through its chief, Scott Worsham.

72. Upon information and belief, the City of Hernando Board of Aldermen must approve all new hires within the police department. **The City of Hernando Board of Aldermen obviously ignored that which Chief Worsham knew and the Board should have known in that Officer Brown should not have been entrusted with a K-9 patrol animal or the very type of incident which resulted in serious physical and mental injuries to Hoyle would likely occur.**

The *Monell* liability claim against the City of Hernando exists, or is at least alleged to exist by Hoyle, by pointing very directly to the notice the City of Hernando had through its policy makers by employing Brown, retaining Brown and failing to train and supervise Brown with a police K-9 in light of a history of abuse with a K-9, and a federal reported case indicating that the conduct of Brown is not protected by qualified immunity.

At paragraph twenty-four (24) of the Amended Complaint, Hoyle, relying on the only facts available to him currently before discovery, states very clearly that the policy maker representative in the form of Chief Worsham and the policy makers themselves knew or should have known of Brown's propensity to misuse his K-9 in violation of citizens' constitutional rights, and yet, it is alleged in the Amended Complaint that the Board of Aldermen and their representative Worsham hired and did not terminate Brown for this very same conduct.

In the case of *Zarnow v. City of Wichita Falls, Texas,* 614 F.3d 1161 (5th Cir. 2010), the Fifth Circuit stated:

> A municipality is a "person" subject to suit under Section 1983. *See Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A local government entity

may be sued 'if it is alleged to have caused a constitutional tort through a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.' *City of St. Louis v. Praprotnik,* 485 U.S. 112, 121, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (quoting *Monell,* 436 U.S. at 690, 98 S.Ct. 2018). Alternatively, municipal liability may attach where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval. *Monell,* 436 U.S. at 690-91, 98 S.Ct. 2018. '[M]unicipal liability under Section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom.' *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir.2001) (citation omitted).

Municipal liability requires deliberate action attributable to the municipality that is the direct cause of the alleged constitutional violation. *Id.* at 391-92, 109 S.Ct. 1197.

The first requirement for imposing municipal liability is proof that an official policymaker with actual or constructive knowledge of the constitutional violation acted on behalf of the municipality. *Cox v. City of Dallas, Tex.,* 430 F.3d 734, 748-49 (5th Cir.2005). A policymaker is "one who takes the place of the governing body in a designated area of city administration." *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir.1984) (en banc). He or she must "decide the goals for a particular city function and devise the means of achieving those goals." *Bennett v. City of Slidell,* 728 F.2d 762, 769 (5th Cir.1984) (en banc). *Zarnow v. City of Wichita Falls, Texas,* 614 F.3d at 166, 167.

In *Zarnow,* the Plaintiff insisted that the police chief, Ken Coughlin, acted as the City's policymaker and was actively aware of the errant plain view policy used in the seizure of items from her home. As such, the Fifth Circuit held that the City impliedly delegated its policymaking authority to the chief of police.

In the case at hand, the police chief, Scott Worsham, knowing exactly what Brown had done in *Cooper,* nevertheless, hired Brown with the City's approval, and then purchased a K-9 for his unsupervised use.

Zarnow asserted that Chief Coughlin and the City effectively ratified the officers' unconstitutional conduct.

16

The Fifth Circuit went on to state:

> To support a supervisory liability claim, the misconduct of a subordinate must be conclusively linked to the action or inaction of the supervisor. *See Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 453 (5th Cir. 1994) (en banc). A supervisory official is liable if he demonstrates deliberate indifference to a plaintiff's constitutionally protected rights. *Id.* at 454.

There is more than enough alleged herein, without the benefit of discovery, to specifically allege *Monell* liability by the deliberate indifference of both Worsham and City's Board of Aldermen, and as such, survives the pending FRCP 12(c) Motion to Dismiss.

When a plaintiff alleges a failure to train or supervise, the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference. *Estate of Troy Davis v. City of North Richland Hills, et. al.,* 406 F.3d 375, 379 (5th Cir. 2005)*; Smith v. Brenoettsy,* 158 F.3d 908, 911-12 (5th Cir.1998); *see Burge v. St. Tammany Parish,* 336 F.3d 363, 370 (5th Cir.2003); *Cousin v. Small,* 325 F.3d 627, 637 (5th Cir.2003); *Thompson,* 245 F.3d at 459; *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 452-54 & nn.7-8 (5th Cir.1994) (en banc) (adopting the *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), standard of municipal liability — that is, requiring at least deliberate indifference — for supervisory liability). *Estate of Troy Davis v. City of North Richland Hills et. al.,* 406 F.3d 375, 381 (5th Cir. 2005).

The *Davis* Court went on to state:

> It may happen that in light of the <u>duties assigned to specific officers</u> or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, a

17

supervisor might reasonably be found to be deliberately indifferent. *City of Canton,* 489 U.S. at 390, 109 S.Ct. 1197; *see Snyder v. Trepagnier,* 142 F.3d 791, 798 (5th Cir.1998). *Davis at 381, 382.*

In *Hoyle,* Brown's role as an abusive special duty officer issued a K-9 doing the same thing he did in *Cooper* cannot be a clearer example of lack of supervision and proper training on the use of force. Of course, the same blatant lack of appropriate use of force training is evident in the actions of Solomon.

It is true that normally, a single incident, as opposed to a pattern of violations, cannot suffice to demonstrate deliberate indifference. It is also true that there is a so-called "single incident exception," but it is inherently "a narrow one, and one that the court has have been reluctant to expand. *Burge,* 336 F.3d at 373 (citing *Pineda,* 291 F.3d at 334-35); *see Gabriel v. City of Plano,* 202 F.3d 741, 745 (5th Cir.2000) ("We have consistently rejected application of the single incident exception and have noted that `proof of a single violent incident ordinarily is insufficient to hold a municipality liable for inadequate training.")(quoting *Snyder v. Trepagnier,* 142 F.3d 791, 798 (5th Cir.1998). To rely on this exception, a plaintiff must prove that the `highly predictable' consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the `moving force' behind the constitutional violation." *Roberts,* 397 F.3d at 295 (quoting *Brown,* 219 F.3d at 461). Hoyle's lawsuit and facts alleged clearly show through common sense that it was very predictable that Brown would wrongfully abuse a suspect with a K-9 if the City of Hernando did not intervene with proper training and supervision. Frankly, the City of Hernando should never have even hired Brown to begin with knowing his propensity.

## CASES RELIED ON BY DEFENDANTS

All of the allegations made by Defendants against Hoyle regarding his misconduct prior to being bitten by the dog ignores the fact that all of the cases cited by Defendants revolve around fleeing suspects who refused to surrender or tried to hide from arrest after being <u>warned</u> to cease resisting, fleeing or hiding. As an example, the Defendants' rely on the case of *Hernandez v. Town of Gilbert, et. al.,* 989 F.3d 739 (5th Cir. 2021). In the *Hernandez* case, following a police chase, Hernandez fled to his home where he activated the remote-controlled garage door opener, remained in control of his car inside the garage for eight minutes, refused multiple commands to get out of the car, and resisted lesser force employed by officers without effect while he continued resisting. To force compliance, defendant much later and after multiple verbal warnings, released his police dog.

In *Hernandez*, before deploying the K-9, the officer used pepper spray to gain surrender without effect. He warned Hernandez eight more times that he was under arrest and needed to get out of the car. He also warned Hernandez at least five times that a police dog would bite him if he did not step out of the car. Hernandez responded, "I'm not going nowhere, dude," "You're on my property, bro. You can't do this shit," and "No, I am not."

In *Hernandez,* the officers did not begin the arrest encounter with a dog bite. Instead, the officers initially gave verbal commands to surrender to their authority. When Hernandez refused to obey, the officers tried control holds. Then they used pepper spray, which failed to achieve compliance. They then warned Hernandez about the impending release of the dog if he refused to yield. Only after all of these methods failed to overcome Hernandez's resistance, did Officer Gilbert deploy Murphy the K-9.

The case law is clear that an officer cannot direct or allow a police dog to continue biting a suspect who has fully surrendered and is under the officer's control. *Watkins v. City of Oakland,* 145 F.3d 1087, 1093 (9th Cir. 1998); *Koistra v. County of San Diego,* 310 F. Supp. 3d 1066, 1082-84 (S.D. Cal. 2018).

The *Hernandez* [FN3] case is completely inapplicable to the case at hand inasmuch as Hernandez had not and would not surrender. Hoyle was indisputably not continuing to flee from Lynn Brown. Hoyle had surrendered. His hands were clearly visible. *Hernandez* actually supports Hoyle's cause of action. Hoyle surrendered; no warnings were given; no escalation of force was applied before Brown deployed his K-9. No de-escalation of force occurred until after Solomon was finished kicking and stomping Hoyle. With armed officers standing right there with Brown to take Hoyle into custody, Brown sent the K-9 and left the K-9 engaged while Solomon beat Hoyle senseless.

Defendants also cite to the case of *Hinson v. Martin*, No. 19-30243, 12-13 (5th Cir. Apr. 29, 2021). As in the *Hernandez* case, the *Hinson* case involves a fleeing suspect who refused to surrender. In *Hinson,* Jason Hinson was wanted on a felony arrest warrant for armed robbery involving a firearm and presumed armed and dangerous. Officer Martin spotted Hinson's vehicle, and once he identified Hinson as the driver, Officer Martin pursued Hinson. Hinson accelerated his vehicle in an attempt to flee. However, Hinson pulled over and ran into a wooded area. Officer Martin deployed his K-9, Rex. Rex found Hinson, caught him by the arm and took him down. Hinson alleged that Officer Martin ordered Rex to release him and bite him again even when Hinson was handcuffed. Hinson alleged that Officer Martin also kicked him in the ribs once he was handcuffed.

---

[FN3] In fact, *Hernandez* actually supports the contention that Brown should not be granted qualified immunity.

The *Hinson* Court stated:

> Merely because a use of force was reasonable (which it was not in the
> Hoyle case) at the outset of an apprehension does not mean that
> the *continued* use of force *remains* reasonable. We must therefore turn to
> Martin's alleged use of force after Hinson had been subdued. *Hinson* at 10.

The Court referred broadly to the time "after Hinson had been subdued" because the facts

were underdeveloped. Hinson alleged, for example, that he was subdued and compliant, but not

yet handcuffed, when Martin unnecessarily ordered Rex to bite Hinson a second time.

The *Hinson* Court went on to state:

> The second and third *Graham* factors therefore indicate that Martin's
> alleged decision to order Rex to bite Hinson and to personally kick Hinson
> in the ribs after he was subdued was objectively unreasonable. This court
> has also held in the past that "permitting a dog to continue biting a
> compliant and non-threatening arrestee is objectively
> unreasonable." *Hinson* at 10-11 quoting *Jacob Cooper v. Lynn Brown, et.
> al.*, 844 F.3d at 524.

The Court determined that Hinson had overcome the first prong of the qualified

immunity analysis by showing facts to support his Fourth Amendment claim that his rights were

violated when he was subjected to excessive force.

If, given existing law, "every reasonable official" would realize that the conduct at issue

constituted excessive force for Fourth Amendment purposes, then the right is clearly

established. *al-Kidd,* 563 U.S. at 741 (internal quotation omitted).

With regard to the *Cooper* opinion, the Court in *Hinson* stated:

> Although the *Cooper* opinion was not published until almost a year after
> the events at issue here, it is nonetheless helpful, because the *Cooper* panel
> had no difficulty finding that an officer had "fair warning" that subjecting
> a compliant and non-threatening arrestee to a lengthy dog attack was
> objectively unreasonable" at least as early as 2013. *Id.* The *Cooper* court
> was also able to point to a robust consensus of opinion that an unnecessary
> or unnecessarily prolonged dog bite was unconstitutional. *Id.* at 525-26
> (discussing cases from the Sixth, Ninth, and Eleventh Circuits). *Hinson v.
> Martin*, No. 19-30243, 12-13 (5th Cir. Apr. 29, 2021).

Additionally, the Defendants cite this Court to *Shumpert v. City of Tupelo*, 901 F.3d 310, 321-323 (5th Cir. 2018).

Interestingly, instead of supporting a finding of qualified immunity, *Shumpert* actually supports removing qualified immunity for Brown and for Solomon.

*Shumpert* involved a suspect who ran into a house after being warned by a K-9 officer to show his hands. The K-9 officer in *Shumpert* not only ordered the suspect to show his hands but informed him that he had a dog, and that it would bite. In light of this warning, the suspect, Shumpert, ran further under the house prompting the K-9 officer to release his dog which then bit Shumpert. Shumpert then filed suit, and the trial court was then required to examine the use of force which included the release of the K-9 to apprehend the suspect.

The trial court in *Shumpert* at page 321 stated that the Plaintiff, Shumpert, had the burden of demonstrating that the K-9 officer, Cook, violated a "clearly established law at the time the challenged conduct occurred."

The *Shumpert* court stated:

> At the time of the challenged conduct, neither the United States Supreme Court nor this court had addressed what constitutes reasonable use of K9 force during an arrest. After that date, this court decided *Cooper v. Brown*, (Lynn Brown) which addressed the issue. *Id.*

The *Shumpert* Court in analyzing Shumpert's claim looked to *Cooper v. Brown* and wrote:

> In *Cooper,* after analyzing the DUI stop of Cooper, the *Cooper* Court examined the conduct of the defendant in this case who was also the defendant in that case, Lynn Brown. The *Shumpert* Court acknowledged that in *Cooper*, the suspect did initially flee law enforcement. The suspect then hid behind either a fence or a garbage can, and that it was dark as it was nighttime. From the discovery depositions taken in the case, the Court

22

determined that at the time of the dog bite, Cooper did not attempt to flee, did not strike the dog, and Brown could see Cooper's hands and 'appreciate[d] that he had no weapon.' *Shumpert* at 322.

The Court in *Cooper* and then the Court in *Shumpert* found:

Despite these facts, Officer Brown did not order the K9 to release the bite until he had finished handcuffing Cooper. *Shumpert* at 322.

The Court in *Shumpert* relied upon the ruling of the trial court and appellate court in

*Cooper* and stated that the *Cooper* court had determined:

Officer Brown's use of K9 force was clearly excessive and unreasonable given the facts and circumstances of that case, so he was not entitled to qualified immunity. The court explained that '[n]o reasonable officer could conclude that Cooper posed an immediate threat to Brown or others.' *Shumpert* at 322.

Additionally, the *Shumpert* Court referred to *Cooper's* holding that stated:

There was no indication he was, or would be, violent. Officer Brown knew that Cooper did not have a weapon. Once Officer Brown found him, Cooper did not resist arrest or further attempt to flee. Rather, he complied with Officer Brown's instructions. <u>Officer Brown, however, did not stop the use of K9 force</u>. Because Officer Brown did not attempt to negotiate and 'subjected Cooper to a lengthy dog attack that inflicted serious injuries, even though he had no reason to believe that Cooper posed a threat,' the court held that the use of force was clearly excessive and unreasonable. *Shumpert* at 322.

In referring to *Cooper*, the *Shumpert* Court found:

Thus, under Cooper, the law is now clearly established that when '[n]o reasonable officer could conclude that [a suspect] pose[s] an immediate threat to [law enforcement officers] or others,' it is unreasonable to use K9 force to subdue a suspect who is complying with officer instructions. *Id.* at 322.

The *Shumpert* Court adopted and reiterated the position of the Fifth Circuit when the

*Shumpert* Court stated:

We emphasized in Cooper that '[o]ur caselaw makes certain that once an arrestee stops resisting, the degree of force an officer can employ is reduced.' Because the officer in Cooper continued to use force and even

23

increased its use while the threat to officers decreased, he violated clearly established law. . . *Shumpert* at 323.

Case law establishes that it is unreasonable to use force after a suspect is subdued or demonstrates compliance.

Brown's conduct in *Cooper* is actually cited to by *Shumpert* and other Fifth Circuit cases that when a suspect, regardless of what that suspect is wanted for, communicates his surrender; the use of a K-9 to apprehend and then continue the bite or using closed fists and feet is objectively unreasonable.

To watch the video in the instant case and to expect Hoyle to lie calmly with his hands still over his head while a dog is continuing to chew on his right leg and Solomon is pummeling him in the face, is not what the constitutional standards require.

The truth of the matter is that as soon as Hoyle's vehicle stopped, Hoyle, without even being commanded to do so, opens his door where he is clearly visible and places his hands above his head.

This is the point in time where this Honorable Court is called on to determine if the actions of Brown, his K-9, Groot, and Solomon were obviously excessive in the use of force in such a way as to remove qualified immunity protection for both of the officers.

## FRCP 12(c) AND FRCP 56

A motion brought pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, is designed to dispose of cases where the material facts are not in dispute, and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts. *5A Wright and Miller, Federal Practice and Procedure*, §1367 at 509-510 (1990). See *J.M. Blythe Motorlines Corp., v. Blalock*, 310 F.2d 77, 78-79 (5th Cir. 1962).

The Motion for a Judgment on the Pleadings only has utility when <u>all</u> material allegations of fact are admitted in the pleadings, and only questions of law remain. *5A Wright and Miller, Federal Practice and Procedure,* §1367 at 511. "This may occur, for example, in . . . litigation in which the sole question is the applicability or interpretation of a statutory provision." The Defendants here have denied or disputed every relevant specifically pleaded fact contained in the Amended Complaint. Thus, if Hoyle's allegations are accepted as true over the Defendants' denials, the 12(c) motion is to be denied.

The central issue in a Rule 12(c) or 12(b)(6) motion is whether, in the light most favorable to the Plaintiff, the Complaint states a valid claim for relief. The court must accept the factual allegations in the pleadings as true, and the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp., v. Twombly,* 127 S. Ct. 1955 at 1974, 167 L. Ed. 2d 929 (2007). If the facts set out in Plaintiff's Complaint, taken as true and drawing all inferences in a light most favorable to Plaintiff, at least raise the possibility that they could succeed in establishing a claim against the Defendant, the 12(c) motion <u>is to be denied</u>. The central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief. *Hughes v. Tobacco Inst., Inc.,* 278 F.3d 417 at 420 (5th Cir. 2001).

Pleadings should be construed liberally, and judgment on the pleadings is appropriate only if there are no disputed issues of fact and only questions of law remain. *Id.* The District Court may dismiss a claim when it is clear that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Jones v. Greninger,* 188 F.3d 322 at 324 (5th Cir. 1999)(*per curiam*). In analyzing the complaint, the court will accept all well pleaded facts as true, viewing them in the light most favorable to the plaintiff. *Id.* The Defendants herein fail in

their argument that no constitutional violation and excessive force occurred, and that Brown and Solomon are to be protected by qualified immunity.

The issue is not whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claim. Thus, the court should not dismiss a claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint. *Jones v. Greninger*, 188 F.3d 322 at 324 (5th Cir. 1999)(Citations Omitted).

The Defendants herein filed a FRCP 12(c) Motion to Dismiss on the pleadings and asked that the Court consider its attachments to their Answer. The attachments to the Defendants' Answer have not been admitted into evidence as no foundation has been laid, and no discovery has been permitted pursuant to the automatic stay provisions, but those attachments consisted of dash cam video without audio, a guilty plea transcript, a training certificate for Brown and the police reports.

Candidly, within the attachments themselves, there are genuine differences and contradictions creating a disputed material issue of fact regarding the claim of excessive force. As an example, Solomon contends that he only struck Hoyle four (4) or five (5) times. The video attached clearly shows a minimum of seven (7) to ten (10) vicious blows with a closed fist to Hoyle's head and face while he is being held by Brown. In addition, the video shows that Solomon then stomped and kicked Hoyle while he was laying on his back with his hands secured behind him.

Brown's report also contains material mistakes, misrepresentations or discrepancies when compared to the video itself and to the Complaint.

The allegations contained in the Complaint are quite specific, and it seems that the gravamen of Defendants' FRCP 12(c) motion argues primarily the qualified immunity of Brown and by extension, the City's *Monell* liability.

If there is a constitutional violation by way of excessive force, which is hotly contested when comparing the Complaint to the Answer, the video and police reports attached, a FRCP 12(c) Motion to Dismiss is improper.

## ARGUMENT

Without the benefit of discovery, but with the benefit of *Cooper's* findings, Hoyle has alleged more than enough of the specifics to survive the dispositive motions filed by Defendants.

Here, Chief Worsham was Brown's supervisor at Horn Lake when Judge Mills very clearly warned future police departments about Brown's darker side with a K-9. Then, when Worsham became the Chief of Police in Hernando, what did he do? He hired Brown and instituted a K-9 department with Brown in charge of it with his own dog.

To establish a claim under § 1983 for excessive use of force, a plaintiff must first show that he was seized. *Flores v. City of Palacios,* 381 F.3d 391, 396 (5th Cir.2004). Next, he must show: "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Id. Goodman* at 397.

As the Supreme Court stated in *Graham v. Connor,* "[i]n addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). *Connor* held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness'

standard." *Id.* at 395, 109 S.Ct. 1865. Thus, "[d]etermining whether the force used to effect a particular seizure is `reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396, 109 S.Ct. 1865. (internal quotation omitted).

With Hoyle's hands in the air and armed officers pointing their gun at Hoyle in the middle of a field in broad daylight; did Hoyle exhibit an attempt to flee? No. Hoyle clearly communicated surrender – a full and complete surrender exhibiting nothing which would place an officer in fear for their safety.

The determination of "reasonableness" under the Fourth Amendment is "not capable of precise definition or mechanical application ... [but] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue (Hoyle irresponsibly ran from the police endangering his own life, other motorists and the law enforcement officers. This conduct is serious, but some portion or share in the irresponsible misdemeanor stop has to be shared with Brown especially if the allegation that Brown was ordered to stop the chase bears out to be true); whether the suspect poses an <u>immediate</u> threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." (After Hoyle's car was stopped, there was no <u>immediate</u> existing threat, and clearly these two (2) factors weigh overwhelmingly with Hoyle). *Id.* (internal quotation omitted). The Court went on to explain that, "[a]s in other Fourth Amendment contexts, however, the `reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are `objectively reasonable' in light of the facts and circumstances confronting them." *Id.* at 397, 109 S.Ct. 1865. *Goodman* at 397.

28

So, as to Brown and qualified immunity, there is more than substantial and specific allegations contained in the Complaint especially if Hoyle garners additional evidence through discovery that supports those allegations, Hoyle will succeed and should not have his case dismissed based upon the extremely early present pleadings. If the Court treats the current status of pleadings as a FRCP 56 Motion for Summary Judgment by considering documents outside of the pleadings, again, the Defendants themselves have created disputed issues of material facts regarding the amount of force or the truth and accuracy of the reported force used within their very exhibits. Therefore, the Rule 56 Motion for Summary Judgment should also be denied if it is considered as such, and if discovery is stayed.

As it relates to the state law claim, the parties have entered a stipulation to remove, as a defense, procedural failures on the part of Hoyle regarding the ninety (90) day waiting period.

As it relates to the liability of the City of Hernando, the well pleaded Complaint taken as true with all inferences in favor of Hoyle, results in the same outcome, a denial of the FRCP 12(c) Motion to Dismiss or FRCP 56 Motion for Summary Judgment.

Allegations supported by specific facts contained in the Complaint as well as contemporaneously filed affidavits of a use of force expert and the Plaintiff himself establish the level of culpability of the City of Hernando's two (2) employees, Brown and Solomon, was in reckless disregard for the safety and health of Hoyle.

Based upon the pleadings before this Honorable Court, in the form of a FRCP 12(c) Motion to Dismiss on the pleadings, or in the alternative, a Motion for Summary Judgment when considering the video tape and police reports of the Defendants, it should be evident that this Court, nor the body of law existing in the Fifth Circuit, could witness these events and dismiss this suit because Hoyle is unable to go behind the curtain of the Hernando Police Department and

unearth smoking gun evidence <u>before</u> filing suit. This Court, Hoyle and those before the Court should frankly be afraid to dismiss what is viewed on the video tape thus giving its stamp of approval of the depicted police conduct. Had it not been for Jacob Cooper, the Fifth Circuit and the City of Hernando would not know of Brown's propensity to use a K-9 as a means to apprehend and subdue suspects who are non-violent and surrendered.

As feared by the Court in *Cooper,* the propensity of Brown has now repeated itself and should not receive this court's stamp of constitutional approval.

The very idea of a police officer cloaked with the responsibility and trust of the citizens to use a dog to subdue a surrendered suspect; pulling the suspect in one direction while the police officer, Brown, pulls the suspect in an opposite direction causing great pain and to then have that set of egregious actions capped off by another Hernando Police Officer, Solomon, using closed fists to beat Hoyle senseless because Hoyle was not relaxing and lying motionless to permit being handcuffed, is insulting to the conscience.

This use of force as depicted cannot and should not stand, and dismissing this cause of action on a FRCP 12(c) motion or FRCP 56 motion will likely escalate that style of injustice.

## CONCLUSION

While Hoyle is confident that this Response and attached Affidavits of Jared Zwickey and Plaintiff, Adrian Hoyle, and the associated facts and pleadings necessarily defeat Defendants' Motion to Dismiss, Hoyle would further submit that any apprehension by this Honorable Court in summarily denying the instant Motion to Dismiss would be satisfied by reserving its ruling on the Defendants' motion(s) until after full and robust discovery is permitted with the Court's lifting of the stay currently in place.

Respectfully Submitted,

SPARKMAN-ZUMMACH, P.C.

*S/Martin Zummach*
Martin Zummach (MS #9682)
7125 Getwell Road, Suite 201
Southaven, MS 38671
662-349-6900 -- Office
662-349-6800 – Fax

*S/Murray Well*s
Murray Wells (TN #21749)
81 Monroe Avenue, Ste. 400
Memphis, TN 38103
901-507-2521 -- Office
901-507-1791 – Fax

<u>Certificate of Service</u>

The undersigned certifies that on the 7th day of October, 2021, a copy of the foregoing document was electronically filed with court clerk using the CM/ECF System which sent notification of such filing to all counsel of record.

*S/Martin Zummach*