IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

ADRIAN HOYLE,

     Plaintiff,

vs.                                                                CAUSE NO.: 3:21-cv-171NBB-RP
                                                                   JURY DEMANDED

CITY OF HERNANDO, SCOTT WORSHAM,
in his official capacity as Chief of Police of the
Hernando Police Department, OFFICER
LYNN BROWN, Individually and in his
official capacity as a Hernando Police Officer,
and OFFICER HUNTER SOLOMON,
Individually and in his official capacity as a
Hernando Police Officer

     Defendants.

## AFFIDAVIT OF JARED L. ZWICKEY

THE STATE OF CALIFORNIA
COUNTY OF SAN JOAQUIN

     BEFORE ME, the undersigned authority, on this day personally appeared Jared

L. Zwickey, who being first duly sworn by me, deposed, and said:

     1.     My name is Jared L. Zwickey. I am over the age of eighteen and have never

been convicted of a crime. Each of the following statements is based on my personal

knowledge, and each fact is true and correct. I have been consulted as a use of force expert

by Plaintiff, in the above captioned case, Adrian Hoyle v. City of Hernando, Scott

Worsham, in his official capacity as Chief of Police of the Hernando Police Department,

Officer Lynn Brown, Individually and in his official capacity as a Hernando Police Officer, and Officer Hunter Solomon, Individually and in his official capacity as a Hernando Police Officer.

2.      Included in my affidavit is a summary of my professional background. I have thirty-eight (38) years of law enforcement experience as a generalist, and forty-seven years of training experience as an administration of justice instructor at the com college level.

3.      I hold a majority of the certifications from the Commissions on Peace Officer Standards and Training ("POST") that can be issued to a law enforcement officer in the State of California, which certify my multiple areas of expertise. Specifically, as a retired law enforcement officer, I hold a Basic, Intermediate, Advanced, Supervision, Management, Executive, California Command College, Firearms Instructor, Defensive Tactics/Impact and Less Lethal Weapons, Narcotics and Dangerous Drugs, Advanced Narcotics and Dangerous Drugs, Basic Academy Director and Academy Instructor of Perishable Skills  Certificates.

4.      I graduated from the FBI National Academy in 1988 after being nominated to attend. The FBI National Academy is a program of the FBI for active U.S. law enforcement personnel and also for international law enforcement personnel who seek to enhance their credentials in their field and to raise law enforcement standards, knowledge and also cooperation worldwide. I am also a graduate of the Force Science Institute human dynamics instructor certification program in Mankato, Minnesota.

5.      I am certified as a Human Factors Analyst by the Force Science Institute, which involves the analysis of the controversial use of force, including the use of video to identify the human factors of mental, (perceptions of what is seen and heard, and vision of how we see under stress/inattentional blindness) emotional (how fear and anger affects the human body) and physical (movement of the human body, evaluation of speed distance and

time) actions of police officers involved in a chaotic and rapidly unfolding critical incident where force is used. The head, arms and body movements of the officers and the Plaintiff are closely evaluated to determine where their focus was, what they said and when, where they were standing at the time that the alleged force occurred, and how much force was used and was that force consistent with any injuries the Plaintiff suffered.

6. When viewing video footage from a body camera, a vehicle dashboard camera, or a surveillance camera of a controversial use-of-force encounter, such as this incident, it requires more than just one viewing of raw footage that is captured by the camera. In fact, three extra steps are often the keys that allow investigators and other interested parties to unlock critical secrets "hidden" in recordings that may not be evident that the eyes did not see at first glance due to the speed and motion of movement.

7. It has been my experience and training over the past forty-seven years that to fully understand the human dynamics and an officer's decision-making in a force incident you should take the video apart frame by frame, regardless of what type of device the video was recorded on. When it comes to analyzing force dynamics "split seconds matter" because some cameras with slow frame rates, for example, may actually miss recording critical moments of action. Video footage, which appears to record a continuous stream of action, is really a series of snapshots taken at timed intervals that vary radically among camera types. "Some dash cameras film at 8 frames a second, some security cameras at 4 frames a second, and body cameras at about 30 frames a second. Being able to see an officer's actions actually timed out on video is much more powerful than trying to imagine it.

8.  I have a bachelor's degree in Administration of Justice from Golden Gate University. I am currently licensed by the California Department of Consumer Affairs, Bureau of Security, and Investigation Services as a private investigator.

9.  I have served as a member of the California Peace Officer Standards and Training (POST) Consortium Advisory Committee and subject matter expert evaluation team, which has as its mission ensuring consistency between training specifications and student workbook training materials for the Basic Academy Course among the multiple training academies in the State of California, based on state and federal statutes and current case law.

10.  I have also served on numerous POST committees as a use of force, K-9 Training/standards/handling, tactics, firearms, and scenario training expert, and as a subject matter expert for Basic Academy Course training materials. The POST committees focus on developing program guidelines for basic and in-service law enforcement certification programs. I also serve on several POST training committees as a subject matter expert and participate in focus training groups to develop in-service and basic training programs for the California Basic Academy training academies, California Penal Code Section 832 programs and K-12 regional occupational programs.

11.  I am an Associate Professor at the San Joaquin Delta College District in Stockton, California, where I teach administration of justice, use of force, criminal law and criminal evidence, and firearms courses. In addition to writing curriculum and teaching college courses for the San Joaquin Community College District over the past twenty-one years, I teach firearms, report writing, defensive tactics, administrative investigations,

criminal law, criminal evidence, search, and seizure and use of force in the Basic Police Officer Academy program and for numerous state and federal law enforcement agencies.

12.　　I have instructed law enforcement officers in use of force, probable cause, search and seizure, firearms, defensive tactics, less lethal weaponry, tactics and arrest and control strategies at the California Department of Corrections, the California Technical Institute for K-9 Handlers, the U.S. Marshal's Office, State and Local Law Enforcement Officers in California and Texas, FBI Agents, civilians, and members of the United States military service.

13.　　I was also employed by the Yosemite Community College District, where I taught administration of justice courses at Modesto Junior College, located in Modesto, California, and at Ohlone College in Alameda County.

14.　　I have taken thousands of hours of continuing law enforcement training during my career as a law enforcement officer. A list of the training classes I completed is attached to my Curriculum Vitae as *Exhibit "1"* and incorporated by reference for all purposes herein. In addition to the hours of training set out on *Exhibit "1,"* I attended daily briefing training, along with community presentations from citizens and members of the law enforcement community during my law enforcement career.

15.　　I first taught on the subject of use of force, field tactics, and arrest and control and defensive tactics strategies in the early 1970's and continuing through my entire law enforcement tenure as a strategy and as a S.W.A.T team member/supervisor/leader, a tactics instructor, a K-9 trainer/officer survival instructor at the California Specialized Training Institute. I have provided instruction in high and low risk traffic stop strategies to deal with radical violent antigovernment groups, firearms, use of force and arrest/control techniques, as

5

a defensive tactics instructor at the POST Police Academy in Pittsburg, California in from 1974 to 1993, and at Delta College in Stockton, California from 1997 to 2020.

16.     I have trained and evaluated police service dogs for police officers and civilians, and I have evaluated numerous law enforcement agencies K-9 policies and procedures for numerous agencies for over twenty years. I have been designated as a subject matter expert for the California Peace Officers Standards and Training Organization that helped established selection and certification guidelines for all law enforcement K-9 programs in the State of California. All law enforcement agencies that deploy a police service dog are essentially required to be certified by a state approved K-9 evaluator. All persons who are selected to certify police dogs in the State of California currently have to complete a state recognized training program before they are able to conduct a certification of the police dog and its handler.

17.     My teaching strategies and tactics over the past forty-seven (47) years has not been geared toward teaching police officers how to respond to every set of unknown circumstances that they may possibly encounter during their patrol duties. Rather, my instruction has been geared toward instructing law enforcement officers to understand and interpret their legal authority, to reasonably understand the basic strategies of awareness, safety for the officer and the suspect, and being prepared for possible responses that other officers used to control a subject who might possibly attempt to harm them with personal weapons.

18.     I have provided instruction in the use of reasonable force, including police service dogs, and a variety of less lethal weaponry, including vehicles and other instrumentalities.

19.     In addition to the teaching, I have personally dealt with armed and dangerous individuals who frequently obstructed, delayed, evaded, and resisted arrest, and individuals who attempted to conceal contraband and possessed dangerous weapons during a personal contact and during an arrest while assigned to uniform patrol duties with and without a police service dog.

20.     During my law enforcement career, I have arrested hundreds of individuals who were under the influence of dangerous drugs, including marijuana and or alcohol. I handled two (2) police service dogs and I became the department K-9 trainer for my agency and a K-9 trainer and consultant for numerous law enforcement agencies on the training and management of K-9 programs. My training also includes minor and major accident investigation and reconstruction methodologies, including skid and speed analysis and metal deformation of damaged vehicles and K-9 use, training, policies and procedures and deployment strategies.

21.     I reviewed the Plaintiff's Amended Complaint, Officer Brown's police report #202114857, Officer Solomon's police supplemental report #202114857, Investigative Notes of Detective Michael Hansbro, the Affidavit of Adrian Hoyle, Municipal Defendants' Motion for Judgement on the Pleadings or in the Alternative, for Summary Judgment and Memorandum in Support (Doc. Nos. 12 & 13); and Answer of the Municipal Defendants with attached exhibits (Doc. No. 10) for the purposes of stating my opinions and conclusions.

22.     On September 22, 2021, I reviewed a dash cam video recording, without audio, from Officer Lynn Brown's vehicle dash cam camera that was recorded at a rate of 30 frames per second.

23.    I viewed the dash camera video that captured the arrest of Plaintiff Hoyle using an EV video player, to compare the action of all involved parties with their statements and the investigative review and analysis.

24.    The software I used to view the video allowed me the ability to review the entire video in its entirety at 30 frames per second, and to stop and cycle the video forward and backwards at 1/30 per second frames.  It is critical to view this video frame by frame at the 1/30 per second rate, because there may be an action that occurs that would be missed if the video were only viewed constantly.

25.    My review of the aforementioned police reports, pleadings and attachments revealed to me that on September 3, 2020, during the daytime hours. He was operating a Hernando Police Department 4 door sedan patrol vehicle. He pursued Plaintiff after he believed Plaintiff failed to stop at a red traffic signal light. Officer Brown pursued the Plaintiff at high speeds and noted he was driving erratically.

26.    Officer Brown wrote a police report stating as Plaintiff approached I-69, he tried to enter the on ramp to highway 69. Plaintiff lost control and ran off the road onto the shoulder of the on ramp.  Brown reported as the Plaintiff attempted to drive back onto the road, Plaintiff's vehicle struck his patrol vehicle and Officer Solomon's patrol vehicle as well, which is not true.

27.    The video footage clearly shows Officer Brown's vehicle intentionally rammed Plaintiff's vehicle, but it was not disabled. Plaintiff continued to drive forward on the shoulder of the roadway and then partially on the paved roadway until his vehicle was cut off by Officer Solomon's SUV patrol vehicle, which caused both vehicles to make impact with one another at the same time resulting in a minor dent on the driver's

side fender of the SUV. Officer Solomon's patrol vehicle forced the Plaintiff's vehicle off of the roadway into a ditch adjacent to the roadway where it came to a complete stop.

28.     Officer Brown's patrol car came to a stop on the onramp at the edge of the roadway facing the rear of Plaintiff's car, which was located in a small ditch. The Plaintiff's car stopped after it rolled backwards at a slight angle for a short distance until the transmission locked up the drive wheel stopping the vehicle from moving, which corroborates Plaintiff's statement that he placed the transmission in park prior to exiting the vehicle.

29.     Officer Brown stated in his police report that when Plaintiff's vehicle came to a stop, Officer Solomon started yelling warnings at the driver, while he retrieved his K-9 from the rear passenger's compartment, but Solomon did not articulate what warnings were given and how many. Officer Solomon said he was unable to see the plaintiff's movements as Plaintiff sat inside his vehicle, while Officer Brown had a direct view of Plaintiff, but according to Officer Brown's police report Brown did not give Plaintiff any orders.

30.     Officer Brown did not document in his police report that he gave Plaintiff verbal K-9 warnings that he would be bitten if he ran or didn't comply with his commands to submit to arrest before he released his dog.

31.     Officer Brown did not document what he did specifically to control Plaintiff when he first approached him, because he wanted to conceal the fact that he used excessive force to arrest Plaintiff.

32.     It is my opinion that Officer Brown should not have commanded his dog to apprehend the Plaintiff because Plaintiff opened his driver's door and remained motionless, he did not run, and he did not make any furtive movements as alleged by Officer Brown, that were consistent with Plaintiff being in possession of a dangerous weapon.

33.     Plaintiff opened his driver's door from inside the vehicle, but when it was opened, Plaintiff appears to shift his upper body towards the open door but remained seated in the driver's seat, because Plaintiff extended his right hand towards the door as he started to stick his head out of the door jam and appears to be looking back at Officer Brown.

34.     Shortly after peering out of the vehicle, Plaintiff's open right hand can be seen being raised upward, followed immediately with his left had just below the roof line.  Both of Plaintiff's palms are pointed in the direction of Officer Brown, which was undoubtedly seen by both Officers Brown and Solomon. Brown notes in his police report that he saw Hoyle's hands up prior to deploying his K-9.

35.     Approximately two seconds later, Plaintiff's hands were lifted higher over the roof of his car as plaintiff begins to stand up.  Plaintiff's kept his hands raised high in the air as he looked at the dog charging him and then raised his right leg as the dog bit Plaintiffs right leg.

36.     As Officer Brown walked towards the plaintiff with his hand on his firearm that was holstered Plaintiff lowered his outstretched arms to his waist and his mouth can be seen wide open as he looks at Officer Brown.   Plaintiff appears to speak to Brown as he extended his left hand towards Brown with an open palm.  Officer

Brown parried Plaintiff's left hand to the side and attempted to pull him away from Plaintiff's vehicle, and then immediately struck Plaintiff in the left side of his face with a closed right fist. Even if Officer Brown believed that Plaintiff may possibly be attempting to hide a weapon as he alleged in his police report; it would have been unreasonable for him to order his dog to attack Plaintiff.

37.     If Plaintiff did have access to a weapon, which he did not possess, it would have been a foolish and a dangerous strategy to command his dog to attack Plaintiff that could have easily resulted in the police dog being killed or injured as well as Officer Brown.

38.     The reasonable strategy that Officers Brown and Solomon should have employed in this incident if they considered that Plaintiff posed a credible threat to their safety, would have been to assume a cover position at their patrol cars and order the Plaintiff out of the vehicle at gunpoint.

39.     If the Plaintiff would not have complied with the officers' orders to submit to arrest, it would have been appropriate for Officer Brown to wait for a reasonable time to elapse for the plaintiff to comply, and then give Plaintiff multiple warnings to leave the vehicle with his hands above his head before he allows his dog to engage Plaintiff. It should be realized that the dog would most likely be injured or killed if Plaintiff was armed or had access to a deadly weapon, which Hoyle did not possess. That is not what occurred in this incident, which would lead a reasonable police officer to believe that Officer Brown should not have commanded his dog to bite Plaintiff who was standing motionless and who did not pose a threat to both officers.

40.     It would have been a sound tactical strategy for Officer Brown to control his police dog and allow Officer Solomon to control the complainant. But Brown did not do that in this incident. If the police dog were to be sent to control any suspect, it is the primary responsibility of the K-9 officer to control his dog, and to remove the dog promptly when a person submits to arrest, which allows the cover officer (Solomon) to handcuff the suspect.

41.     Regardless of any hypothetical situation where Officer Brown's police dog is deployed, Officer Brown must have maximum control over his police dog at all times, and he should have the ability to verbally recall his dog or to command the dog into a down position before the Plaintiff was bitten. As equally important is Officer Brown's ability to verbally command his dog to stop biting Plaintiff before he handcuffed the Plaintiff, in compliance with the law that existed at the time of this incident, and especially after Plaintiff was repeatedly struck with unreasonable and repeated blows to his face, head, and upper body, by Officers Brown and Solomon which can be seen on the dash cam video.

42.     It is my opinion that Officer Brown saw or reasonably should have seen Plaintiff was obviously surrendering before he commanded his police dog to bite the Plaintiff. Officer Brown had a duty to stop his police dog from attacking the Plaintiff when he saw the plaintiff facing him with both of his hands over his head. Officer Brown ignored his duty to use only that amount of force that was objectively reasonable to take Plaintiff into custody.

43.     Due to the fact that I was unable to review Officer Brown's police dog training deployment and certification training records, as well as his department's K-9

12

use policy, I am unable to offer an opinion as to whether or not Officer Brown's dog is capable of verbally recalling the dog from biting Plaintiff or to verbally order his dog to release while he was biting Plaintiff so that he could be handcuffed. I am also not able to determine if Officer Brown's police dog was certified for patrol use by a credible unbiased evaluator based on a recognized law enforcement standard, and if the use of his dog to bite the Plaintiff under the facts and circumstances of this incident was in accordance with department policy.

44.     I also reviewed Plaintiff's affidavit regarding the facts and circumstances of his arrest and analyzed the dash cam video in an attempt to corroborate the plaintiff's statements based on his perceptions.

45.     Plaintiff states he did not run any red lights on Highway 51, and while it appears that the cycle of the signal lights was green when Officer Brown made a U-turn to pursue Plaintiff's vehicle, it is difficult to determine what cycle the signal lights were at the time Plaintiff passed over the limit line.

46.     Plaintiff admits that as he drove through the City of Hernando, he noticed a police car with his blue lights on following him and he fled from the police. Plaintiff said as he lost control of his vehicle in a grassy area near Interstate 69 at Getwell Road he was struck by a police car which pushed the vehicle into the grassy area. He stated that a second police vehicle struck him which forced his vehicle back into the grassy area where his vehicle came to a stop.

47.     The Plaintiff's statement was compared to the video footage and was corroborated. Officer Brown's police car struck the plaintiff's vehicle first and then

Officer Solomon's vehicle collided with Plaintiff's vehicle and forced Plaintiff's vehicle into the grassy area where it came to stop in a ditch.

48. The Plaintiff stated that after his vehicle stopped, he immediately put the vehicle in park, he released his seat belt and opened the driver's door with his left hand and held it open with his right hand due to the fact that his vehicle was tilted at an angle. He said that when the driver's door was opened, Plaintiff kept both hands at or over his head and told the police officers, "I surrender." "I'm sorry." Plaintiff said as the police dog approached him, he recalls letting out a scream and also repeated, "I surrender, I surrender." Plaintiff said he never put his hands down while surrendering, but he stated that when Officer Brown tried to pull him away from his vehicle, the police dog pulled him in the opposite direction.

49. While the video footage does not show the plaintiff removing his seatbelt, nor is there audio to verify the statements he made to Officer Brown, the footage corroborates the plaintiff's statement that his vehicle was placed in park when it stopped moving in the ditch. It also shows the plaintiff holding the door open with his right hand and it shows Plaintiff extending his arms over his head before Brown deployed the police dog to attack Hoyle. The video shows Plaintiff looking directly in the direction of Officer Brown and saying something to Brown as he approaches Plaintiff, but his words were not recorded and could not be interpreted.

50. The video footage corroborates the Plaintiff's statement that he kept his hands up over his head until Officer Brown grabbed his left hand and struck him in the face with his right fist. After Officer Brown struck Plaintiff, Plaintiff recovered from

14

the blow and immediately tried to raise his hands, but Brown grabbed his shirt and pushed Plaintiff back up against Plaintiff's vehicle.

51.     Plaintiff stated that Officer Solomon approached him and without warning, hit him in the face with his fist approximately 4 to 5 times while the police dog was biting him.

52.     I reviewed the video footage and compared Plaintiff's statements against the video footage and noted that the video corroborates the Plaintiff statement that Officer Solomon approached Plaintiff and immediately struck Plaintiff in the face with his left open palm and his right fist in the face and head, however the number of times Officer Solomon continued to hit Plaintiff was far greater than what the plaintiff recalls.

53.     Plaintiff moved his right arm forward towards Officer Solomon as Officer Brown grabbed a hold of Plaintiff's left arm that appears to be an act of trying to avoid being struck by Solomon.  Officer Solomon struck Plaintiff in the face with his right fist, which caused Plaintiff to buckle his knees and start to fall forward on his knees toward the ground.  Plaintiff was on his knees when Officer Solomon brought his right arm backwards and hit Plaintiff in his upper body at the same time Officer Brown pulled Plaintiff back up to a standing position.  As Officer Brown pulled Plaintiff backwards Officer Solomon brought his right arm backwards again and hit Plaintiff in the face with his right fist, which caused the Plaintiff to buckle and fall into a seated position on the ground.

54.     After Plaintiff fell to the ground, Officer Solomon bent over and appears to hit the Plaintiff's in the face with his right fist and then he grabbed a hold of

Plaintiff's left arm. Officer Solomon let go of Plaintiff's right arm and appears to deliver another blow to Plaintiff's body with his right fist. Officer Solomon began to stand up and then delivered a downward blow to Plaintiff's body with his right fist.

55.    Officer Solomon stopped hitting Plaintiff and grabbed Plaintiff's left leg to stretch his body out flat presumably so that there would be better control to handcuff him. Officer Solomon then grabbed the police dog's collar or neck and held onto him as the dog continued to bite Plaintiff and while Officer Brown handcuffed Plaintiff.

56.    Plaintiff stated that while Officer Brown was handcuffing him, the police dog continued to bite him on the right leg. Plaintiff said after Officer Brown handcuffed his hands behind his back, Officer Brown walked over to his dog and pulled the dog off of his leg. Plaintiff said the police dog did not want to let go of his leg, and he said when the dog was pulled off of his leg, the pain hurt as much as when the dog first bit him.

57.    I reviewed the video footage and compared the plaintiff's statements with that of the video and noted that the footage corroborates Plaintiff's perspective when Officer Brown lifted his police dog upward from the ground to remove the dog's jaws from Plaintiff's leg. It should be noted that, according to Plaintiff's affidavit, one of the unidentified officers who was present when Plaintiff was being handcuffed, asked Officers Brown and Officer Solomon, "When are you going to get that dog off him."

58.    Plaintiff states that while the police dog was biting him, he kept his hands out so that Officer Brown could see him and his hands as he approached Plaintiff. Based on what was visible of the Plaintiff's hands it appears he attempted to keep his hands upright and visible as Officer Brown was attempting to handcuff him, but the

officers' bodies blocked a clear view of Plaintiff's body and hands at times making it difficult to determine how long he was able to keep his hands upright.

59.    Plaintiff said he looked Officer Brown in the eye, and again screamed, "I give up. I surrender." Plaintiff states the police dog continued to chew and bite his right leg and his foot. Due to the fact that there was no audio on the video I was unable to corroborate Plaintiff's statements.

60.    Plaintiff stated that after Officer Brown handcuffed him with his hands behind his back, Officer Solomon stood and jumped on his chest. Plaintiff yelled out, "I don't want to die today, please stop." Plaintiff stated Officer Solomon then kicked and stomped Hoyle's head with Solomon's boot while Solomon's other boot was in Hoyle's chest. Plaintiff described the experience as someone who was wiping their feet on a floor mat except that Officer Solomon was a very heavy weight on his chest and head.

61.    I reviewed the video footage and compared Plaintiff's statements against the video footage and noted that the video corroborates the Plaintiff statements, with the exception of what the African American Officer reportedly said to his fellow officers because there was no audio.

62.    Officer Solomon released his hold on the police dog just as Officer Brown gained a hold of his police dog's collar or neck. Officer Solomon then walked toward the plaintiff as the Plaintiff lay on the ground. Officer Solomon grabbed the Plaintiff's head and upper body and forced him backwards onto the ground while the police dog continued to bite and hold onto Plaintiff's right leg. Officer Solomon can be seen placing his right hand on the side of the Plaintiff's vehicle to brace his body while he

17

repeatedly stepped and stomped on the Plaintiff's upper body and chest with both of his feet as Officer Brown physically removed his police dog from the Plaintiff's right leg. While Officer Solomon was assaulting Plaintiff, Officer Brown and two unidentified police officers watched Officer Solomon hitting and stomping Plaintiff, Officer Brown and two unidentified police officers watched Officer Solomon using unnecessary and unreasonable force to punish the plaintiff, but none of them intervened to stop the abuse.

63.     There can be no more glaring evidence of a custom, practice, or policy of a police department where 100% of the Hernando City Police officers present on video, clearly observe unreasonable and excessive force of another law enforcement officer, and yet fail to intervene or bring administrative and criminal charges against those officers.

64.     Plaintiff stated that after he was arrested, and before he left the incident scene, he asked the officers if they could take him to get medical care. He said they put him in the back of a police car driven by an African-American officer and drove him to the hospital. The officer reportedly told Plaintiff, "Once your car stopped, you were not resisting. I saw your hands up. I don't know why they did all of that."

65.     Officer Solomon stated in his police report that after he forced Plaintiff's vehicle off of the roadway, he exited his vehicle, but he could not see the Plaintiff's movements inside the car due to the angle of the plaintiff's vehicle that was stopped in the ditch. He stated that for his safety, he did not immediately approach the car until after Officer Brown sent his dog to apprehend the Plaintiff.

66.     Officer Solomon was standing adjacent to Officer Brown's patrol car on the right front passenger's side in an elevated position where he was able to look down on the plaintiff's vehicle.

67.     It should be noted that upon reviewing the dash cam video, Officer Solomon had removed his firearm from its holster when he first exited his vehicle that was parked on the shoulder of the roadway as the Plaintiff's driver's door was opening, possibly because he was anticipating that the Plaintiff posed a threat to his safety.

68.     Officer Solomon held his service pistol in a low carry position, for approximately 1-2 seconds after the plaintiff's car came to a complete stop, and as the driver's door of the plaintiff's vehicle was opened.

69.     At approximately 3 seconds after the driver's door of the Plaintiff's vehicle opened, the Plaintiff's left hand was extended over the roof of his vehicle that Officer Solomon saw or should have clearly seen from his elevated position on the shoulder of the roadway.  At approximately 4 seconds after the plaintiff's vehicle came to a complete stop, the plaintiff's hands can be seen being raised even higher over his head.

70.     At approximately 5 seconds after the Plaintiff's vehicle stopped, Officer Brown deployed his dog to attack the plaintiff. Officer Brown approached Plaintiff and attempted to throw the Plaintiff to the ground while the police dog was biting Hoyle's right leg.

71.     Officer Solomon moved down the shoulder of the roadway towards the Plaintiff, with a holstered firearm, because I believe Officer Solomon no longer considered the Plaintiff to pose a threat to either officer.

72.     Based on both Officer Brown and Solomon's police reports and the Investigation Notes of Detective Hansbro, Officer Brown released his dog to attack the Plaintiff without first giving the Plaintiff a loud verbal warning that he would be bitten if he didn't comply with his commands to submit to arrest.  If Officer Brown had given the Plaintiff a K-9 warning Officer Solomon would have documented what the warning was in his police report.

73.     Approximately 4 seconds after Plaintiff's vehicle came to a stop, Plaintiff had already opened the driver's door, and had shifted his body to exit the vehicle. He opened the driver's door and propped it open, then raised both of his hands in the air.

74.     Any reasonable officer seeing Plaintiff's hands in the air would have immediately recognized that Plaintiff was not trying to escape; he was not trying to hide contraband or a weapon; he was signaling that he was submitting to arrest.

75.     While the Plaintiff was raising his hands higher in the air, Officer Brown released his dog without a leash, with the intent to bite and hold onto the plaintiff. The police dog bit and held onto the Plaintiff's right lower leg within 2 seconds after Officer Brown ordered his police dog to attack the Plaintiff as Plaintiff stood facing Officer Brown with both of his hands visible and held high in the air.

76.     The use of a police dog to bite and hold onto the Plaintiff who was not trying to flee, and was not resisting arrest, but was submitting to arrest and therefore the level of force used by Officer Brown was not only unnecessary, it was excessive and unreasonable under the circumstances where Plaintiff did not pose a risk to the officers on the scene.

77.     I reviewed Detective Hansbro's investigation notes, which appears to be an overview of what Officers Brown and Solomon told him; it was not a thorough use of force investigation.  A thorough and complete use of force investigation would determine whether Officer Brown failed to follow his supervisors' order to terminate the pursuit, whether Officer Brown had truthfully and adequately advised his supervisor of the traffic conditions and speeds attained,  if Officer Brown was authorized by department policy to use a Pursuit Intervention Technique (PIT) to terminate the pursuit, and to determine if the use of a police service dog or the use of any force by the involved officers was consistent with department policy, state and federal statutes and case law.

78.     Detective Hansbro knew that Officer Brown saw the Plaintiff standing with his hands up before he sent his police dog, because he documented that fact in his memorandum, but Detective Hansbro did not recognize or he ignored the fact that using a police dog to bite an individual who was obviously not resisting and did not pose a threat to Officers Brown and Solomon was unlawful, and that Officers Brown and Solomon repeatedly struck with their fists and feet the Plaintiff.  Detective Hasnbro but especially Officer Brown knew or should have reasonably known that the use of a police dog is not permissible when deployed, without a verbal warning against a compliant, non-fleeing,  non-threatening suspect who is complying with an officer's orders. *Jacob Cooper v. Lynn Brown, et., al.,* 156 F.Supp.3d 818 (N.D. Miss. 2016)*; Jacob Cooper v. Lynn Brown* 844 F. 3d 517 (5th Cir. 2017); *Shumpert v. City of Tupelo*, 901 F. 3d 310, 321-323 (5th Cir. 2018).

79.     In my opinion Officer Brown and Solomon's assault on Plaintiff by allowing a police dog to bite Plaintiff when he was not resisting arrest, constitutes an aggravated assault, and then to repeatedly batter Plaintiff was in violation of 18 U.S Code 242-Deprivation of Rights Under the Color of Law. Officers Brown and Solomon purposely, under the color of their authority, knowingly and recklessly subjected Plaintiff to a lengthy dog attack that caused Plaintiff great bodily injury. Plaintiff also suffered injuries when Officer Solomon repeatedly punched Plaintiff and repeatedly stomped on Plaintiff's chest and head while Officer Brown's police dog continued to bite and injure Plaintiff's leg, even when the Plaintiff was lying on the ground handcuffed. Officer Brown did not physically remove his police dog from biting Plaintiff until Officer Solomon repeatedly stepped and stood on Plaintiff's chest and head.

80.     Detective Hansbro did not review the dash cam video, or if he did, he intentionally ignored the amount and the type of excessive force Officers Brown and Solomon used to take the Plaintiff into custody.

81.     Detective Hansbro did not investigate whether or not the deployment of Officer Brown's police service dog was consistent with department policy, and whether or not it was consistent with state and federal statutes and case law. Detective Hansbro did not interview the plaintiff, the unidentified officers who witnessed the unlawful conduct of Officers Brown and Solomon, and he didn't interview Officers Brown and Solomon either.

82.     If Detective Hansbro had reviewed the dash cam video, he would have clearly seen Officer Brown hitting the Plaintiff with his right fist at frame recording

8:19 and he would have seen Officer Solomon repeatedly strike the Plaintiff with closed fists at frame recording 8:21 through 8:32 while the police dog was biting him and while Officer Brown was trying to handcuff Plaintiff.

83.    Detective Hansbro would also be able to see Officer Solomon begin to step and stomp on Plaintiff while the dog was still biting plaintiff at frame recording 9:08 through frame 9:12 all while the police dog continued to bite and shake Plaintiff's leg.

84.    Detective Hansbro did not document or investigate who, if anyone gave Plaintiff verbal warnings, but he did document the fact that Officer Brown reported that he was concerned that because Plaintiff was not coming out of his vehicle, he was attempting to hide a weapon.

85.    If Officer Brown had exited his patrol car and immediately went to the rear passenger door where he retrieved his police dog, which he did, he would have seen Plaintiff open his driver's door within 1 second after Plaintiff's car came to a stop. Officer Brown would have seen Plaintiff extend both of his hands out of the car in plain view, and if he was looking at the Plaintiff's vehicle before he released his dog off lead, which he admits he was in his police report, he had to see both of Plaintiff's outstretched arms over his head. Plaintiff was clearly surrendering, and it was obvious that Plaintiff did not pose an immediate threat to the officers prior to Brown ordering his dog to attack Plaintiff.

86.    I am familiar with Officer Brown's prior law enforcement experience as a K-9 handler and his inappropriate use of force with his police dog while employed by the City of Horn Lake, Mississippi. I provided testimony as a law enforcement use of

force expert for the plaintiff in substance that Officer Brown inappropriately used excessive force to arrest numerous citizens of Horn Lake, by using his dog to bite misdemeanor citizens without first giving a warning they would be bitten by the police dog, in violation of department policy. *Jacob Cooper v. Lynn Brown, et., al.,* 156 F.Supp.3d 818 (N.D. Miss. 2016)*; Jacob Cooper v. Lynn Brown* 844 F. 3d 517 (5th Cir. 2017).

87. Officer Brown should have been, by the time of this arrest of Hoyle, trained to understand that it is against state, federal statutes, and current case law to allow a police dog to bite a non resisting suspect who is surrendering, since he was the focus of the above prior Federal Court of Appeals decision. If Officer Brown wasn't properly trained how to use his police dog when he worked for the City of Horn Lake, which in my opinion he wasn't, based on his illegal and unconstitutional conduct, it's hard to believe when viewing the Hoyle arrest, that Brown was properly trained by the Hernando Police Department after being made aware of the judicial outcome in the arrest of Jacob Cooper. It should be noted that the City of Hernando's Police Chief is the same individual that was Lynn Brown's supervisor at the City of Horn Lake Police Department at the time Officer Brown was involved in the Cooper matter.

88. Based on a review of Officer's Brown's conduct in this incident it is apparent that Officer Brown has not been properly trained how to perform his K-9 law enforcement duties lawfully, and it appears that he has not been held accountable for his incomprehensible conduct by his supervisors and the Police Chief.

89. Officer Brown should have been trained to recognize the fact that the use of a police dog to bite and severely injure a non-violent and non-resisting Plaintiff is excessive and unreasonable and should be contrary to the Hernando Police Department

Policy and law enforcement procedures. If Officer Brown were properly trained, he would have understood that a police dog used to apprehend an individual is better understood as an instrumentality of force, like a baton, and is judged according to the rules that apply generally to the police using force. Substantial force that inflicts serious injury was not reasonable and necessary according to the circumstances confronting Officer Brown at the time force was used in the arrest of the Plaintiff. In my opinion, from a simple viewing of the dash cam video, Officer Brown is still using a K-9 use of force to do that which any minimally trained police officer can do without injury to the suspect. That is, safely apprehend, control and arrest a criminal suspect with verbal commands and warnings to gain compliance. Minimally trained law enforcement officers handcuff felony suspects every day without the use of K-9's or batons when the suspect signifies surrender.

90. Had Officer Brown been properly trained, he would have understood that the issue of the force used is determined by the reasonable necessity; the force proportionate to the apparent need to take a suspect into custody; and to prevent escape and to overcome resistance. The video clearly shows that Hoyle surrendered, did not flee, and did not resist the officers.

91. Officer Brown should have been trained to understand that as applied to the use of police dogs, the reasonable standard means a dog bite is justifiable and reasonable if and only if the threat to officers or the public is serious and the need for force must be sufficient to justify the injury of a dog bite. The need for force, not the injury inflicted, makes the amount of force used lawful or unlawful. Once Hoyle signified his surrender, which was prior to the commanded attack of the K-9, the use of K-9 force was not justified or reasonable.

92. No reasonable officer, faced with the same or similar facts and circumstances known to Officer Brown at the time Plaintiff stepped out of his vehicle with his hands held high over his head, would have deployed a police dog to bite him. Using a police dog under those circumstances is a violation of Officer Brown's duty of care, the force he used to arrest Plaintiff was excessive, and the subsequent assault on the plaintiff that he committed and allowed Officer Solomon to commit was illegal.

93. Officer Brown documented and admitted in his police report that the Plaintiff had his hands up as he exited the vehicle. Officer Brown said in his police report that the reason why he released his dog to apprehend the Plaintiff while the Plaintiff's hands were visible and raised because as Plaintiff was exiting the car looking around, and according to Officer Brown believed that the Plaintiff was attempting to hide a weapon.

94. The video footage contradicts Officer Brown's statement and raises more questions about his motivation. The Plaintiff was not looking around as he attempted to exit his vehicle with both of his hands held high in the air as Officer Brown alleges, Plaintiff was looking at Officer Brown the entire time waiting at Plaintiff's vehicle to be taken into custody.

95. While Officer Brown's dog was biting and shaking the Plaintiff's leg, Officer Brown rapidly approached Plaintiff and grabbed Plaintiff's left arm and tried to throw him to the ground. Officer Brown documented in his police report that the Plaintiff resisted his and Officer Solomon's efforts to take him into custody. This is also untrue. Plaintiff's actions clearly communicate surrender and compliance. Officer Brown did not describe how Plaintiff supposedly resisted him nor did he document what

steps he took to overcome this reported resistance. This lack of documented resistance contained in Officer Brown's police report is most likely because Brown knew that Plaintiff did not resist arrest.

96.     Officer Solomon struck the Plaintiff in the face with a palm strike with his left hand, and then he punched the Plaintiff in the head with his right fist followed by an uppercut to the left side of the Plaintiff's face.

97.     The Plaintiff attempted to prevent being hit by reaching out at Officer Solomon. Officer Solomon punched the Plaintiff in the right side of his face with his right closed fist causing Plaintiff to fall to his knees while the police dog was still biting him.

98.     Officer Solomon continued to hit the Plaintiff in the face and to the body approximately seven more times, for a total of 10 blows while the police dog continued to bite him and while Officer Brown was holding onto the Plaintiff's left arm. Had Officer Solomon been properly trained, Solomon's use of physical force to control the Plaintiff while Officer Brown's police dog continued to bite and hold onto the Plaintiff, was unnecessary, unreasonable, and excessive.

99.     Had Officer Solomon been property trained in arrest and control techniques he would have recognized that using a closed fist to repeatedly hit Plaintiff in the head and face and body without first trying to control Plaintiff, while it may appear glamorous and effective on television and in the moves, it is highly discouraged by defensive tactics and arrest and control instructors.  Law enforcement executives also discourage officers from "punching" suspects with their closed fists, and many agencies restrict officers from using a closed fist strikes, because of a high potential of on-the-job

injuries that could place the officer in jeopardy if their hand became injured to the point where they could not defend themselves if attacked or use their weapon not to mention that it could also be a career ending injury.

100.    Had Officer Solomon been properly trained, he would have understood that the issue of the force used is determined by the reasonable necessity; the force proportionate to the apparent need to take a suspect into custody, and to prevent escape and overcome resistance. At the time Solomon struck the Plaintiff in the face and head with his closed fists, Hoyle was not an escape risk or risk to the safety of the officers or public.

101.    Officer Solomon should have been trained to understand that it is against state, federal statutes, and current case law to allow Officer Brown to use his police dog to bite Plaintiff, who is a non-resisting suspect who is surrendering, but he did not intercede but did nothing to stop Officer Brown's use of force. He should have also realized that he was committing an aggravated assault against Plaintiff using his fists and feet to repeatedly step on the Plaintiff's chest while Plaintiff was handcuffed and was being repeatedly bitten by the police dog.

102.    Had Officer Solomon been properly trained he would have been able to differentiate between arrest/control concepts and defensive tactics techniques.  Training in arrest and control techniques teaches officers how to take a suspect into custody using control holds and take down techniques, while defensive tactics provides police officers with techniques such as the use of impact weapons, including electronic control devices, chemical agents, the officer's hands, arms, and feet as a defensive tool in the event they are assaulted or when they try to overcome resistance from an aggressive, combative,

and assaultive suspect. In the arrest of Hoyle, none of the physical strikes performed by Solomon were necessary or evidence of training.

103. Plaintiff was not aggressive, combative, or assaultive when he was confronted by Officers Brown and Solomon, and therefore, the officers should have been trained what arrest/control techniques to use instead of immediately resulting to overreacting by repeatedly assaulting Plaintiff instead of using less violent force options. Based on a review of Officer Solomon's conduct in this incident it is apparent that Officer Solomon has not been properly trained how to perform his law enforcement duties lawfully, and it appears that he has not been held accountable for his incomprehensible conduct by his supervisors and the Hernando Police Chief.

104. No reasonable officer, faced with the same or similar facts and circumstances known to Officer Solomon at the time Plaintiff stepped out of his vehicle with his hands held high over his head, would have repeatedly punched, kicked and stomped Plaintiff's lungs, chest and head before and after he was handcuffed.

105. Officer Brown saw or he should have reasonably seen Officer Solomon repeatedly hitting the Plaintiff in the face, head, and upper body while the police dog was biting and holding onto the Plaintiff's right leg, but Brown did not intercede and did nothing to stop Officer Solomon's excessive use of force.

106. Officer Solomon completed a police report to document the facts and circumstances of his involvement of the Plaintiff's arrest. Officer Solomon stated that he heard Officer Brown yell that the Plaintiff was reaching toward Plaintiff's lower back and stated that Officer Solomon immediately struck the Plaintiff once in the face. The video footage does not corroborate Solomon's alleged reason for striking the plaintiff, even in the absence of audio.

Officer Solomon stated that when the Plaintiff threw a punch at him, Officer Solomon said he struck the Plaintiff two more times. Officer Solomon's statement is untrue. It is interesting to note that Officer Brown did not mention the Plaintiff supposedly reaching to his lower back in his police report, which is also not corroborated in the dash cam video.

107.    Officer Solomon further stated in his report that when the Plaintiff was reaching for his lower back/waistline, Officer Solomon said he was in fear for his life and struck the Plaintiff one last time before the Plaintiff was handcuffed. Officer Solomon's statement is untrue. The video footage clearly contradicts what Officer Solomon documented in his police report regarding the type and amount of force he used to control the Plaintiff and his rendition of what occurred when he confronted the Plaintiff.

108.    Officer Solomon struck the Plaintiff immediately when Officer Solomon approached the Plaintiff, not in response to the Plaintiff taking a swing at him. The police dog was biting the Plaintiff's leg and Officer Brown was pulling Plaintiff's left arm in one direction while the K-9's was pulling Plaintiff in the opposite direction when Officer Solomon punched the Plaintiff in the face.

109.    When the Plaintiff fell to the ground while still being bitten by the police dog, Officer Brown was holding onto the Plaintiff's left arm. The Plaintiff's right hand can clearly be seen reaching upward towards Officer Solomon, not behind his back, as Officer Solomon punched the Plaintiff and then grabbed his right arm. Officer Solomon then punched the Plaintiff a third and fourth time. Officer Solomon then grabbed the Plaintiff's left leg and pulled his body away from the Plaintiff's vehicle and in the opposite direction of the K-9's pull and then grabbed a hold of the police dog's collar as Officer Brown brought the Plaintiff's arms behind his back in

preparation for handcuffing while the police dog continued to bite and hold onto the Plaintiff's right leg.

110.    As the Plaintiff was being handcuffed, two unidentified police officers appear in the video footage. One of the officers stood at the rear of Officer Solomon making it difficult to observe all of the actions of both Officers Brown and Solomon as they were handcuffing the Plaintiff.

111.    Approximately 43 seconds after the police dog first attacked the Plaintiff and bit his right leg, Officer Brown stood up from kneeling alongside the Plaintiff and grabbed ahold of what appears to be his dog's collar or his neck.

112.    It is evident from the video footage that the Plaintiff is experiencing extreme pain due to the fact that the police dog continues to bite and shake his leg as he lay on the ground handcuffed.

113.    While Officer Brown held onto his police dog, the police dog is still biting the Plaintiff, Officer Solomon let go of the police dog and walked toward the Plaintiff as the Plaintiff lay on the ground. Officer Solomon grabbed the Plaintiff and forced his head and upper body backwards onto the ground while the police dog continued to bite and hold onto his right leg. Officer Solomon can be seen placing his right hand on the side of the Plaintiff's vehicle to brace and keep his body stabilized while he repeatedly stepped on the Plaintiff's upper body and chest with both of his feet, as Officer Brown physically removed his police dog from the Plaintiff's right leg, all while two unidentified police officers watched but did not intervene.

114.    It is my professional opinion that the amount and the type of force Officer Brown and Officer Solomon used before and after the Plaintiff was placed in handcuffs while a police dog was biting the Plaintiff, was unnecessary, unreasonable, and excessive. It is equally

disturbing that during much of the excessive force used by Officers Brown and Solomon that was captured on the video, the two unidentified officers stood by and watched the abuse but did not intervene. The officer's viewing Brown and Solomon's use of force exemplifies in the clearest terms either an absolute lack of proper training or worse, a custom and policy of the Police Department to violate the constitutional rights, with excessive force, a surrendered suspect. Based upon my years examining videos of interactions between police and suspects and my training and experience in Human Factors Analysis, it is my opinion that it is evident that Brown and Solomon were acting out of uncontrolled anger at having been led on car chase, and regardless if the suspect surrendered, they both were going to extract from the suspect physical pain and punishment. Both Brown and Solomon had no qualms about their use of excessive force in the presence of other Hernando officers, for no other obvious reason than they were comfortable that their conduct would not be stopped or reported.

115.    I am qualified to render an opinion as to the use of deadly force, K-9 use, and training, Human Factors Analysis, law enforcement procedures and based on my longstanding training as a police officer on this topic, my experience as a subject matter expert on use of force, tactics and law enforcement policies and procedures, and my qualification as an instructor in use of force, K-9s, firearms, and special tactical events for the past 47 years.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED THIS THE ___7___ day of October, 2021.

JARED ZWICKEY