## Page 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRANSCRIBED VIDEO RECORDING OF PRESS CONFERENCE:
ATTORNEYS_SPEAK_OUT_AFTER_HERNANDO_ARREST

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DATE OF RECORDING: NOVEMBER 9, 2021
DATE TRANSCRIBED: NOVEMBER 15, 2021

TRANSCRIBED BY: DANA GORDON, CCR #1908

REPORTING BY DANA, LLC
Post Office Box 1362
Brandon, Mississippi 39043
(601)-506-3440
DanaDMoulder@gmail.com

## Page 2

INDEX

Title Page.................................. 1
Index....................................... 2
Transcribed Recording....................... 3
Certificate of Court Reporter............... 32

## Page 3

\* \* \* \* \*

MR. ZUMMACH: -- firsthand knowledge -- good cops in the City of Hernando have attempted to rid of this -- rid that police department of this cancer. They've gone to the police chief. They've gone to the mayor. They've gone to the board of aldermen saying, "This is not an officer that we need out on the streets, and we surely don't need him out there with a dog and a gun."

Many of these officers were punished for their complaining about this very officer. And, again, that's going to unfold over time -- both with this lawsuit and what else is coming down the pike.

Good cops don't want bad cops around them because they endanger the good cops' lives, and they also endanger citizens' lives. So this is not about, there are bad cops out there or the phrase you hear about, there's, you know, one bad apple. That's not what this is about.

This is also not about race. I want to make that very clear. This is not about

## Page 4

race. This is not about politics. What happened to Mr. Hoyle in this case -- he happens to be an African-American, but this officer did the exact same thing to another kid back in 2013. He was a white kid suspected of DUI, and the same thing happened. This does not have anything to do with race. In this community, we make everything about race and politics.

This has everything to do with right and wrong, and I believe that's why we've heard a recent announcement that the FBI has launched an investigation. I know nothing about how that -- I'm saying it right here on the record. I know nothing about the FBI deciding to open up a case. I had nothing to with it. They make their decisions.

They have an entire hierarchy that they have to go through to get investigations opened. They don't just open them up willy-nilly, and I don't know anything about that investigation or what's going to come from it.

But I will tell you -- and I'm going to play this whole video for you, and you

Page 5

1  can use of it what you want. Videos are
2  sexy because you can't deny what's here on
3  the video, but there is a companion case --
4  I call it a companion case. It was filed on
5  the same day represented by the same lawyers
6  called White versus The City of Hernando.
7      And in my personal opinion, that case
8  is much more sinister, and I know Mr. Wells
9  is going to speak further on that. There's
10 evidence missing. We have two dead kids
11 involving the same officer chasing a car
12 when he was told not to chase a car.
13     These are sexy because you have a
14 dash cam video and you can see what happens,
15 but I do not want that family -- and, again,
16 I hope Murray addresses it fully, that's out
17 there as well.
18     Now, lawyers get bad raps. We're
19 always in it for the money. I can tell you,
20 my age and how long I've been doing this,
21 I'm not in it for the money. In fact, I
22 went to the mayor of the City of Hernando
23 before this lawsuit ever got filed, and I
24 said, "You get rid of these people that did
25 this and I won't file suit."

Page 6

1  I've known this one particular
2  officer now for over 25 years. This is not
3  my first time I've run across this officer.
4  And the mayor shrugged his shoulders at me
5  and that officer continued to work, so I had
6  to file this lawsuit.
7      And then what do I get? When we
8  filed this lawsuit, the lawyer they hired to
9  defend it, second line in his answer says,
10 "It's all a sham." And I would invite
11 anybody that watches this and reads the
12 police report written by this officer and
13 the one that does the punching -- read those
14 two police reports and see what is a sham.
15     There is not one fact in these two
16 complaints that are on file -- there is not
17 one fact that I put in any of those lawsuits
18 that I don't have a witness for, so it's not
19 a sham.
20     And so we're fighting with the City
21 of Hernando now. They think the case is a
22 sham and it's all about money and all that
23 business. Now, I've noticed on a few of
24 your reports, the police chief, I think,
25 confirmed for a good many of you that the

Page 7

1  FBI is in town or opening an investigation.
2  That's about the only comment that was made.
3  I think it was to 24.
4      If you want a quote, I've checked
5  this out from my two sources. Within the
6  last 48 hours, the police chief told the
7  mayor and a few other people that the FBI
8  has told them, "We are reluctantly doing
9  this. We are only doing this because our
10 boss is making us."
11     In other words, they're just going to
12 slow walk and half walk through this. I
13 don't believe that. But when you have a
14 police chief telling the chief executive
15 that -- "Don't worry about this FBI
16 investigation," I think there is something
17 serious for the media to look at because,
18 frankly, it's the lawyers and the media that
19 keeps everybody honest.
20     All right? But that's a quote for
21 you. Scott Worsham told the mayor, "There's
22 nothing to this FBI investigation."
23     So I guess really we have to ask
24 ourselves, do we want kids that play on the
25 playground and help other people to become

Page 8

1  cops or do we want the bullies to become the
2  cops?
3      I'm not doing this for the money. As
4  I've already said, I've told them we
5  wouldn't even file the lawsuit if they got
6  rid of these cops because they're going to
7  hurt somebody.
8      All right? Now, I'm going to go
9  through the video with you. I will stop it
10 wherever you want me to stop it, okay, and
11 answer any questions you have.
12     I will tell you that we know of at
13 least two terminations -- terminations means
14 that the supervisor on duty tells the
15 officer chasing to terminate the pursuit.
16 Every police agency in this region and
17 probably across the country -- if you're
18 told to terminate, you are to immediately
19 pull over, put it in park, call in your
20 mileage to dispatch so that they know how
21 far you continued on, okay, and wait until a
22 supervisor comes, reads the mileage on your
23 odometer.
24     That's what happens when you
25 terminate a pursuit -- if it's dangerous, if

Page 9

1  the underlying crime is not something of a
2  serious nature, et cetera.
3      We know -- I think from one of the
4  reports that have the dispatch tapes, we
5  know that at 33 seconds prior to what I'm
6  going to call the pit maneuver, where the
7  cop cars come in contact with the suspect's
8  car, they were told to terminate. And I
9  want you to watch on this video how long
10 33 seconds is.
11     All right. So -- all right. I'm
12 going to go back to the very beginning --
13 and believe me, I'm not going to make you
14 watch the Dukes of Hazard for seven a half
15 minutes.
16     Okay. This is on Highway 51 facing
17 southbound at Robinson Road. Lynn Brown's
18 police report says he witnessed Mr. Hoyle
19 run a red light. I think Lynn Brown has
20 X-ray vision.
21     Notice these cars coming to a stop on
22 the cross street. There goes Mr. Hoyle.
23 Lynn Brown backs up and begins the pursuit.
24     All right. That is at 0015. This
25 goes on for another seven and a half

Page 10

1  minutes.
2      Mr. Hoyle is driving irresponsibly.
3  The police officer is giving pursuit.
4  People are put in danger, et cetera. I
5  believe we've heard a report that dispatch
6  didn't even know that Mr. Brown was at work
7  that day.
8      I'm sure all of you have watched the
9  seven and a half minutes; is that correct?
10 If so, nod your head, yes. I don't want to
11 waste your time.
12     I'm going to fast forward to 7:26.
13 Why do I go to 7:26? Because if you take
14 33 seconds, which is the latest possible
15 order to terminate pursuit, you just take
16 26 from 8. Okay?
17     And I will tell you that the
18 termination order was done at Getwell and
19 Byhalia Road. That's Byhalia Road. That's
20 Getwell running north and south. My
21 calculations say this is when the call went
22 out to terminate the pursuit.
23     Now, I'm going to let the running
24 record speak. If the officer is doing what
25 they're supposed to do, you pull over right

Page 11

1  there, call in your odometer. Instead, they
2  told the lieutenant to standby.
3      First impact occurs at eight even.
4  I'll also tell you, the second vehicle is
5  the one driven by Hunter Soloman. The first
6  vehicle making contact is driven by
7  Lynn Brown.
8      All right. We're at 8:07. I will
9  tell you that I watched this video probably
10 a hundred or more times, and I couldn't ever
11 tell when Mr. Brown let the dog out of his
12 car. Watch the reflection in the trunk of
13 the car and you will see Lynn Brown get out
14 of his car.
15     And look at what Mr. Hoyle is doing.
16 Now, prior to that, you can see both hands,
17 but I don't want to split hairs like lawyers
18 do. His right hand is holding the door; his
19 left hand is holding the door. So you can
20 see both hands even before this; there were
21 no weapons.
22     Read Lynn Brown's police report. He
23 says he was fearful of a weapon.
24     You see a dog yet? It's 8:15. His
25 hands have been up for approximately two

Page 12

1  seconds, one and a half seconds.
2      If you look in the reflection, that's
3  Lynn Brown holding the dog, about to release
4  it. Does everybody see what I'm talking
5  about? Look at it at your station.
6      In case there is any question,
7  Soloman is not pulling that dog off the
8  suspect, he's just redirecting that dog
9  because that dog never lets go of the leg
10 until Brown takes his handcuffs and wedges
11 the dog's mouth off of his leg. That dog is
12 still on him.
13     This dog is still engaged. Now, I
14 want to stop here. It appears these two
15 officers are blocking the cam. They --
16 they're not doing it on purpose. I happen
17 to know that because only the canine cars
18 have dash cams. But I want you to watch
19 between their legs what Soloman does to
20 Mr. Hoyle while he's handcuffed. Do you see
21 what he's doing?
22     After that they search, pat him down.
23 No weapons were found. I can leave it
24 running, whatever you want to do. You-all
25 have copies of it by now.

Page 13

1  I want to open the floor now to
2  Mr. Wells, answer any questions you have.
3  And as I said, nothing's off the table.
4      MR. WELLS: Afternoon all.
5  It's disturbing. It's troubling.
6  But more importantly, it's kind of the start
7  of what we believe to be a bigger issue and
8  I don't know if you say coverup, but I'm
9  saying coverup.
10     This case coupled with the second
11 case that's here, Linda White, resulting in
12 the deaths of two young boys -- the
13 similarities are that they were both pulled
14 over for something minor, traffic offenses.
15     In the case -- in the White case, the
16 boys were -- had temporary tags, drive-out
17 tags and the officer found it suspicious,
18 pursuit, order to terminate. Lynn Brown
19 refuses to terminate, chases them up the
20 wrong side of I-55 and eventually, we
21 believe, nudged the car off of a bridge
22 where it landed upside down and those boys
23 lost their lives as a result of it.
24     He -- Officer Brown had no
25 information about how many people were in

Page 14

1  the car, that they committed any crimes,
2  whether or not the driver of the car was
3  fleeing against the advice of the
4  passengers. We don't have any of that
5  information because our clients are dead.
6      As soon as that happened, I was
7  engaged by the families to understand what
8  happened, and so I immediately sent a letter
9  to the chief of police, to the mayor, to
10 Lynn Brown and surrounding law enforcement
11 areas that may have caught something on
12 their radio. And what I said is, "We're
13 looking at this and we want this evidence
14 preserved."
15     Specifically, we wanted the police
16 car parked because I can take experts in.
17 They can download the data off of it. We
18 can determine whether or not he bumped the
19 car, whether or not he caused the crash,
20 whether his story is consistent. They've
21 destroyed that evidence. They didn't
22 preserve anything.
23     We believe that they've destroyed
24 photographs. They've destroyed the data on
25 the car. They sold the car at an auction

Page 15

1  despite -- and they could have had it back
2  in action in two days because I would've had
3  my experts down there immediately to take a
4  look at it. They've destroyed all this
5  information.
6      Again, Lynn Brown was instructed to
7  terminate the pursuit and didn't and two
8  boys lost their lives; and as I understand
9  it, took photographs on his personal phone
10 of the deceased young men and made jokes
11 about them and did make jokes about the
12 color of their skin. Other officers
13 complained. He did it in the presence of
14 others.
15     And, again, there was an instruction
16 to not file an abusive report, we believe,
17 directly from the chief of police -- would
18 not allow other officers to report bad
19 behavior of Lynn Brown because there are
20 good officers down there. And that's two
21 separate occasions where other officers have
22 wanted to report Lynn Brown for excessive
23 force and been denied by Chief Worsham.
24     So we believe the case is -- is -- is
25 evolving. And I'll make an interesting

Page 16

1  point. I do a lot of civil rights
2  litigation. I have litigated police
3  departments many times. And to a T, those
4  cases -- the police department says, "Those
5  officers, if they did something wrong, were
6  not doing it in accordance with our policy."
7      In each of those cases, they say,
8  "It's a bad officer who did bad things, but
9  that's not how we do things so we're not
10 responsible for the things that this officer
11 did."
12     These two cases are very different,
13 very different. If you look at the response
14 filed by the same lawyer on behalf of the
15 police officers and behalf of the city and
16 behalf of the chief of police, they embrace
17 it. The police department officially
18 embraces the action of Lynn Brown. That's a
19 strange thing to me. I don't understand it
20 because they're saying, A, there is nothing
21 wrong. We know there is something wrong.
22     B, we're okay with it; so if the
23 officers did something wrong, they acted in
24 accordance with our policy.
25     It may make my job a lot easier, but

Page 17

1   it's a more systemic troubling situation
2   because now you wonder, right, what else has
3   this police department condoned by this
4   officer or Officer Soloman or other officers
5   and refused to acknowledge it and rather
6   embrace the bad behavior.
7        So that's what's particularly
8   troubling to me, especially, in light of the
9   serious injuries to Adrian Hoyle and the
10  loss of life to the two young men.
11       So I'm happy to answer any questions
12  you have.
13       MEDIA SPEAKER: So the two lawsuits,
14  you know, obviously different plaintiffs,
15  different outcomes but a lot of similarities
16  when you read them back to back.
17       Do you think that there is going to
18  be a few common denominators -- but I mean,
19  is leadership a common denominator and the
20  issues in the complaints outlined in both of
21  these lawsuits?
22       MR. WELLS: Absolutely. And I think
23  there's -- there's almost implicit
24  permission to continue the behavior because
25  when you're on notice and you do nothing or

Page 18

1   you refuse to even accept a complaint from
2   another police officer, that encourages the
3   officer to act badly because now that
4   officer knows there is no repercussion,
5   there is no responsibility or accountability
6   for the bad behavior.
7        There are very similar traits on both
8   lawsuits. Both are completely minor
9   incidents for which the -- there's no --
10  there's no suspicion of a stolen vehicle in
11  the Hoyle case. There was no suspicion of
12  any crime at all in the White case, so
13  there's no reason to pursue.
14       Both vehicles flee. The lieutenant
15  on charge in both cases ordered a
16  termination of that pursuit. Lynn Brown
17  ignored the termination order and continued
18  to engage and as a result, there's death and
19  serious bodily injury, so I do think there
20  are a lot of similarities.
21       We were intentional when we filed
22  these lawsuits along the same track, along
23  the same time because we want to cast a big
24  spotlight on what's happening down there,
25  how this is being allowed to happen and why

Page 19

1   these officers -- particularly, Lynn Brown,
2   still has a job.
3        He's -- he's not on administrative
4   leave. He is badged up. He's on desk duty,
5   but he's still working. It's an -- an
6   embracement of that kind of culture that is
7   incredibly scary and should be scary to
8   everybody and is also scary to legitimate,
9   good, solid, honest police officers.
10       MEDIA SPEAKER: What was Chief Scott
11  Worsham's initial, I guess, response or
12  reasoning for the family's initial complaint
13  -- well, for both incidents? What was
14  his --
15       MR. WELLS: We received no response
16  at all. And to be clear, I sent the letter
17  on the White case in 2019 --
18       MEDIA SPEAKER: 2019.
19       MR. WELLS: -- in the summer of 2019.
20  I think it was early -- early June of 2019,
21  maybe July. No response, silence. No
22  attorney reached out to me. No city
23  official reached out to me. No law
24  enforcement reached out to me. It was just
25  a complete silence.

Page 20

1        Then, again, as Mr. Zummach
2   explained, we let them know about the Hoyle
3   case. We said, "There is another problem.
4   Same guy." No response again.
5        The first response that we got from
6   anybody official at the Hernando Police
7   Department was that we were bad actors and
8   that this was a bogus lawsuit and had no
9   merit and then they put in a pleading.
10       And I'll say that people that know
11  me, I file pretty aggressive pleadings
12  sometimes, and sometimes I use words that
13  maybe I shouldn't use in a pleading because
14  I'm inflamed or impassioned about the cause
15  I'm fighting.
16       I've never seen the kind of response
17  to our lawsuit that the City of Hernando
18  filed. It was full of accusations that --
19  none of which were true. But the response
20  was, "We're the city and we're going to --
21  guess what? We're going to hit you back
22  too."
23       And they -- and they did it. They
24  put in a pleading. And the language is --
25  when you read their response and their

5 (Pages 17 to 20)

REPORTING BY DANA, LLC
(601)-506-3440

Page 21

1  motion to dismiss on the Hoyle case -- just
2  reading you go, "Why? Why is this the
3  response?"
4      So that was the first real response
5  we heard was, pounds hand, "We love our
6  officers. You guys are wrong. See you
7  later."
8      MEDIA SPEAKER: Can you talk about
9  the spoilage? When did you find out that
10 the evidence you asked to be preserved was
11 not preserved?
12     MR. WELLS: After the filing of the
13 lawsuit. We -- so it's a widely used legal
14 mechanism to send a letter to preserve
15 evidence. And what you're doing is: You're
16 putting the party on notice that there's
17 litigation coming and that these are the
18 things we're going to need to prosecute our
19 case. And there are -- there are
20 repercussions for destroying evidence.
21     But nobody can deny that they got the
22 letter because they were sent certified and
23 I have their signatures. Everyone got the
24 letter and through conversations with
25 counsel when we began to ask, "Where is the

Page 22

1  car?"
2      They're like, "What do you want to
3  see the car for?"
4      I'm like, "Well, because it's
5  supposed to be parked and I'm supposed to
6  get data from it and I'm supposed to
7  determine how fast he went on the pursuit,
8  when the termination came, whether or not
9  there was impact, all that information."
10     "Well, you know, we sold the car, but
11 we could get it for you later to look at
12 it." Two years later, which is completely
13 worthless to the point of preservation.
14     And it's our understanding that,
15 likewise, files have been destroyed or lost.
16 I don't know if they were destroyed or not,
17 but they're not going to be produced for us.
18     I think it's important to note that
19 there were no criminal charges in the White
20 case filed against anybody. None of the
21 four passengers of that car, the two
22 survivors were charged with any crime.
23     MR. ZUMMACH: To that point regarding
24 the missing evidence, you just call down to
25 the City of Hernando and ask the clerk there

Page 23

1  when Lynn Brown's car was sold. They'll
2  know because they don't sell cars. They
3  sold the car that was involved in the White
4  case that probably had physical damage to
5  it, they sold it to the City of Senatobia
6  Police Department without giving any notice
7  to anyone.
8      I would suspect it probably got
9  repaired down in Senatobia, but what is more
10 interesting to me, at least, is instead of
11 calling an outside agency like MBI to come
12 in and investigate this fatality crash,
13 which would be customary for most agencies,
14 they investigate it themselves.
15     They had an investigator named Mike
16 Hansboro. Mike Hansboro came out with a
17 digital camera, took over a hundred and
18 twenty some-odd photographs of the wreck
19 scene and worked the criminal file up in
20 case criminal charges were brought against
21 the deceased. That file that was worked up
22 for the district attorney's office, as well
23 as the camera, as well as the photographs
24 have all amazingly gone missing.
25     Now, you tell me, where's the sham?

Page 24

1      MEDIA SPEAKER: What kind of damages
2  are you seeking?
3      MR. WELLS: The lawsuits are for, I
4  think, 10 and 12 million respectively. I
5  think that's right. We want accountability.
6  That's what we're seeking, and I know some
7  of you have talked to Linda White, and her
8  concern has got nothing to do with money.
9      Obviously, we're asking for money.
10 We obviously want to sanction this and make
11 this so expensive for the city that they
12 train their officers, they check their
13 officers, they do the right things from now
14 on because they don't want to lose their
15 budget.
16     Yes, so we are seeking monetary but
17 more importantly, the mothers want this
18 officer not to be on the streets. That's
19 what they asked for. That's what they've
20 said from day one, that this officer is
21 harmful to a community. He's not
22 protecting, he's hurting.
23     And so the real justice may come from
24 the department of justice with the FBI
25 investigation, and that may be where we end

Page 25

1  up in terms of how this ends because it's
2  very clear to us that the City of Hernando,
3  Scott Worsham and the Hernando Police
4  Department are not going to take any
5  disciplinary action against this officer,
6  none. And so what we want is -- is a
7  microscope, a spotlight and the ability to
8  stop this from happening next time.
9      MEDIA SPEAKER: Are you surprised
10 that someone under FBI investigation is
11 sitting on desk duty and not, like,
12 suspended from pay, like, still in the
13 building and working?
14     MR. WELLS: I'm very surprised that
15 he is on duty. I'm very surprised that he
16 has access to witnesses and he has the
17 ability to influence perhaps those witnesses
18 in some kind of way, through intimidation or
19 suggestion.
20     Putting the defendant or the
21 potentially accused in the same room with
22 the people who are going to have to stand up
23 against him at some point is awkward. It's
24 not professional and it shouldn't happen.
25 He should go home. If they want to pay him

Page 26

1  to stay at home, send him home but don't let
2  him further muddy an already completely
3  botched investigation and further encourage
4  the destruction of evidence and coverup.
5  Send him home and then let's figure out what
6  happened because, yes, I'm very surprised
7  that he's allowed to interact with the good
8  officers at the Hernando Police Department.
9      MEDIA SPEAKER: You guys have alluded
10 to that, you know, more is coming, and it
11 sounds like more kind of show -- would it be
12 showing proof or evidence of this kind of
13 code of silence or these officers being shot
14 down who did want to report excessive force?
15 Is that what you guys are -- are
16 anticipating?
17     MR. ZUMMACH: Right now there is a
18 motion to dismiss pending in federal court,
19 so we're not allowed to take discovery.
20 We're not allowed to ask questions. We're
21 not able to take depositions, but we already
22 know exactly who we're about to depose and
23 every one of the facts that's contained in
24 those complaints will come out.
25     But right now there is a local

Page 27

1  federal rule that says discovery cannot
2  happen when the city says that the officers
3  entitled -- are entitled to protection of
4  qualified immunity. Because they filed
5  their answer saying, "This is all a big
6  sham, and Lynn Brown had no idea that he
7  wasn't supposed to sick his dog on somebody
8  and leave him on somebody for nearly a
9  minute."
10     That's what they said, he's entitled
11 for qualified immunity. There's a federal
12 local -- there's a local rule. There's also
13 a federal rule of procedure that says you
14 can't take discovery until the judge rules
15 on that.
16     Now, if the judge rules on that and
17 says, "No, we're not going to give -- the
18 judge is not going to give the officers
19 qualified immunity," then we get to start
20 taking depositions and then I can assure you
21 that every fact in those lawsuits will be
22 borne out under oath.
23     MR. WELLS: And the phone is ringing
24 with other people who have been attacked by
25 Lynn Brown's dog. We are receiving calls

Page 28

1  from citizens who say, "Hey. This happened
2  to me as well."
3      He's got a well documented court
4  history of malicious intent with his dog.
5  At his previous job, he got sued. It went
6  to the court of appeals. There's a
7  published opinion, Cooper versus Brown, that
8  talks about Lynn Brown -- that talks about
9  the nasty nature of his use of a dog in a
10 sadistic fashion.
11     So it shouldn't be a surprise to
12 anybody that he has that, and we do think
13 that there will be more history with respect
14 to Lynn Brown and his use of dogs that we
15 think is going to come to light that is
16 going to be very telling for the (inaudible)
17 and for the Court.
18     MR. ZUMMACH: (Inaudible) use of a
19 dog, officers will tell you, that they make
20 felony arrests every day just like this.
21 And what you do -- what the officer does is
22 -- especially with other armed officers out
23 there with their weapons at the ready, you
24 have the person get out of the car with
25 their hands up. You've all seen it. You

Page 29

1  make them walk back towards you, get on
2  their knees, you handcuff them.
3      Felony arrests are made every day.
4  This guy uses a dog and 1200 pounds per
5  square inch to go get the guy first, latch
6  onto him, and then I'll go put my handcuffs
7  on him when I get around to it. That's what
8  happened. That's what happened here.
9  That's what happened in the Cooper case.
10     And every cop will tell you, a dog is
11 a weapon. It is no different than a TASER.
12 It is no different than a gun. You don't
13 get -- you don't just pull a gun out and
14 shoot somebody when they get out of the car.
15 They're felons -- they're felony suspects
16 but you don't shoot them; you don't tase
17 them and you don't send the dog unless
18 they're refusing to surrender or they're
19 running. And as you can see, he was
20 surrendered and he wasn't going anywhere.
21     Read Lynn Brown's report. He says,
22 "The hands were up but I thought he might
23 have a weapon -- he might be hiding a
24 weapon."
25     Every canine expert in the world will

Page 30

1  tell you, that was the worst and meanest
2  thing they could do to that dog. That's
3  right, the dog. You know why? Because if
4  you thought for one second that that suspect
5  had a gun, you just sent your dog in there
6  and he's about to get killed.
7      There is, like, not one justifiable
8  thing about this dog attack.
9      MEDIA SPEAKER: And both those
10 lawsuits have that current stay on them, and
11 so is that basically where this case
12 basically stands --
13     MR. WELLS: Procedurally --
14     MEDIA SPEAKER: -- right now, waiting
15 for that judge's -- okay.
16     MR. WELLS: That's correct. We're
17 waiting for the judge to lift the stay. We
18 expect it to be lifted. We -- if there are
19 facts -- unless they just admit everything,
20 there are facts in dispute.
21     As soon as the judge says there are
22 facts in dispute -- which we believe he
23 will. We are optimistic he will -- then
24 Katy bar the door because we're going to
25 come. We're going to come fast, and we're

Page 31

1  going to start to get answers to what
2  happened.
3      MEDIA SPEAKER: When do you guys
4  estimate that the judge will (inaudible.)
5      MR. WELLS: There is no -- no
6  touching what a judge does. I never know.
7  I've had cases that it happened immediately.
8  I've had cases that take -- take months and
9  months and months for the judge to do a
10 ruling. I don't look into their minds.
11     They have educated clerks. They're
12 smart people. There's a reason they're up
13 there. We trust them to do the right thing
14 and we just sit and wait for that to happen.
15     All right. Well, thank you, guys,
16 for your time.
17     (Inaudible crosstalk.)
18     (End of video recording.)
19         * * * * *

Page 32

1           CERTIFICATE OF COURT REPORTER
2
3      I, Dana Gordon, Court Reporter and
4  Notary Public in and for the County of Rankin,
5  State of Mississippi, hereby certify that the
6  foregoing pages contain a true and correct
7  transcription of the testimony that was later
8  reduced to typewritten form by means of
9  computer-aided transcription to the best of my
10 skill and ability.
11     I further certify that I am not in the
12 employ of or related to any counsel or party in
13 this matter and have no interest, monetary or
14 otherwise, in the final outcome of this matter.
15     Witness my signature and seal this the
16 16TH day of NOVEMBER, 2021.
17
18         DANA GORDON, CCR #1908
19
20 My Commission Expires: June 12, 2024

Page 32

1       CERTIFICATE OF COURT REPORTER

2

3            I, Dana Gordon, Court Reporter and

4  Notary Public in and for the County of Rankin,

5  State of Mississippi, hereby certify that the

6  foregoing pages contain a true and correct

7  transcription of the testimony that was later

8  reduced to typewritten form by means of

9  computer-aided transcription to the best of my

10 skill and ability.

11           I further certify that I am not in the

12 employ of or related to any counsel or party in

13 this matter and have no interest, monetary or

14 otherwise, in the final outcome of this matter.

15           Witness my signature and seal this the

16 16TH day of NOVEMBER, 2021.

17

18                               DANA GORDON, CCR #1908

19

20 My Commission Expires: June 12, 2024

21

22

23

24

25

REPORTING BY DANA, LLC
(601)-506-3440